# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

———————————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| JASON BO-ALAN BECKMAN and THE OXFORD PRIVATE CLIENT GROUP, LLC, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| HOLLIE BECKMAN, | : | |
| | : | |
| Relief Defendant. | : | |

———————————————————————————

## COMPLAINT

Plaintiff United States Securities and Exchange Commission alleges as follows:

## NATURE OF THE ACTION

1.     The Commission brings this law enforcement action to charge another of

the leading figures behind a fraudulent scheme that raised at least $194 million from

close to 1,000 victims.  The Defendants were some of the primary fundraisers for the

fraud, and they did so through material misrepresentations and omissions of material

facts.

2.     The Defendants are Minnesota resident Jason Bo-Alan Beckman

("Beckman") and his registered investment advisory firm, The Oxford Private Client

Group, LLC ("Oxford PCG").  The Relief Defendant is Beckman's wife, Hollie

Beckman.

3.      From at least August 2006 to July 2009, Beckman and Oxford PCG raised

at least $47.3 million from at least 143 investors through a fraudulent, unregistered

offering of investments in a purported foreign currency trading venture (the "Currency

Program").  His fraud was part of a bigger scheme orchestrated by and with Trevor Cook

and several associates.  Beckman played a significant role in the fraud, raising almost

twenty-five percent of the funds invested in the Currency Program (*i.e.,* $47.3 million of

the $194 million).

4.      The investors suffered significant losses from their investments in the

Currency Program.  As a group, the investors of Beckman and Oxford PCG suffered

losses of at least $39.1 million.  That is, at least $39.1 million of the $47.3 million was

lost.  The remaining $8.2 million was returned to investors in the form of purported

interest or a return of principal.

5.      Unlike his investors, Beckman profited from the fraudulent Currency

Program.  From September 2006 to April 2009, the Beckmans received approximately

$7.8 million from accounts containing the investors' funds.  They used the funds to pay

for million-dollar homes, luxury cars, foreign travel, country-club expenses, a suite at

professional hockey games, and other trappings of a high-end lifestyle.

6.      Relief Defendant Hollie Beckman received funds derived from the

fraudulent offer and sale of interests in the Currency Program.  She had no legitimate

claim to such funds.

7.      Many of the victims were investment advisory clients of Beckman's firm, Oxford PCG.  Beckman and his firm owed their clients a fiduciary duty.  Beckman and Oxford PCG violated their fiduciary duty and took advantage of their clients' trust and confidence by feeding them a series of lies and half truths about the Currency Program.

8.      Beckman personally, and indirectly through employees and independent contractors of his firm, represented to investors that their money would be invested in the Currency Program.  He represented that their money would be used exclusively for foreign currency trading.  He represented that their money would be held in segregated accounts.  He represented that there was little or no risk to their investment, and that they would receive guaranteed returns ranging from 10.5% to 12%.  He also represented that investors could withdraw their money at any time.

9.      Those representations were false.  A significant portion of the funds was never used for foreign currency trading at all.  Instead, much of the investors' money was paid to other investors as purported interest and principal payments.

10.      The Currency Program was far from low-risk.  A portion of the funds was used for foreign currency trading, and such funds were lost through high-risk trading practices.

11.      The guaranteed returns were fictitious.  During most of the period, the trading was unprofitable and ultimately sustained a net loss of approximately $68.3 million.  The Currency Program did not yield positive returns, and there was no factual basis for such a guarantee.

12.     The investors' funds were not placed in segregated accounts at banks or trading firms.  Instead, the investors' funds were pooled together.

13.     Defendant Oxford PCG mailed account statements to investors that purported to reflect substantial, continuing profits from foreign currency trading.  The account statements were a fraud.  In reality, under Beckman's direction, an employee of Oxford PCG simply took the amount of the investment, multiplied it by the guaranteed rate of return, and calculated the supposed profits from currency trading.  The exercise was pure arithmetic, and the "profits" existed only on paper.  The account statements did not reflect the real-world returns from the currency trading.

14.     The guarantee about the withdrawal of funds was false as well.  Like many other Ponzi schemes, the Currency Program allowed certain investors to withdraw certain funds at certain times.  But the entire Currency Program would collapse if a sufficient number of investors demanded the return of their funds at any given time. When the scheme ultimately collapsed, investors were unable to withdraw their funds as Beckman had promised.

15.     Before promoting the Currency Program, Beckman had no prior training or experience in currency trading.  Despite his lack of experience, Beckman lured his clients into a highly speculative Currency Program, and did so based on false pretenses. He caused tens of millions of dollars to be lost, and profited from doing so.

16.     Beckman and Oxford PCG remain in the investment advisory business. He poses a continuing risk to the investing public.

17.     Beckman and Oxford PCG, directly and indirectly, have engaged in and, unless enjoined, will continue to engage in acts, practices, transactions, and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), and 80b-6(2)].

18.     The Commission brings this lawsuit to hold the Defendants accountable for their flagrant and repeated violations of the federal securities laws; to freeze and preserve the assets held by the Defendants and Relief Defendant; and to prevent further harm to investors.

## JURISDICTION AND VENUE

19.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

20.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14].

21.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

22.       Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the District of Minnesota and elsewhere.

23.       Beckman and Oxford PCG, directly and indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

24.       Beckman and Oxford PCG will, unless enjoined, continue to engage in the acts, practices and courses of business set forth in this Complaint, and acts, practices and courses of business of similar purpose and object.

## **DEFENDANTS**

25.       **Jason Bo-Alan Beckman**, age 42, is a resident of Plymouth, Minnesota and the owner and principal of The Oxford Private Client Group, LLC, an investment advisory firm registered with the Commission.  Beginning in 1990, Beckman has worked as a registered representative for various registered broker-dealers.  During the period of the offering at issue here, Beckman was a registered representative for Western International Securities, Inc. and NRP Financial, Inc., both broker-dealers registered with the Commission.

26.       **The Oxford Private Client Group, LLC** is a Minnesota limited liability company formed by Beckman in 2005.  Oxford PCG is in the business of advising others, for compensation, about investments in securities.  Oxford PCG has been registered with the Commission as an investment adviser since 2005.

27.     Beckman owns and exercises control over Oxford PCG.  Beckman manages the business and affairs of Oxford PCG and makes all of its investment decisions.  Beckman's titles at Oxford PCG have included senior portfolio manager, managing director, and chief investment officer.  Beckman represented in filings with the Commission that he is the 100% owner of Oxford PCG.

## RELIEF DEFENDANT

28.     **Hollie Beckman**, age 39, is Defendant Beckman's wife.  She is the joint account holder, with Defendant Beckman, of several accounts that received millions of dollars of investor funds.

## RELATED ENTITIES AND INDIVIDUALS

29.     **Trevor Cook**, currently incarcerated, was charged by the Commission on November 23, 2009 with violating the registration and antifraud provisions of the securities laws for his role in the Currency Program scheme.  In March, 2010, Cook pleaded guilty to one count of mail fraud and one count of tax evasion in a criminal case brought by the U.S. Attorney's Office in Minneapolis.  He was subsequently sentenced to 25 years in prison.

30.     **Patrick Kiley** is a resident of Minneapolis, Minnesota.  On November 23, 2009, the Commission charged him with violating the registration and antifraud provision of the securities laws for his role in the Currency Program scheme.

31.     **UBS Diversified Growth, LLC, Universal Brokerage FX Management, LLC, Oxford Global Advisors, LLC** and **Oxford Global Partners, LLC** were Minnesota limited liability companies.  None of these entities had a business

purpose other than to serve as entities through which Cook, Kiley, and Beckman offered and sold foreign currency investments.  On November 23, 2009, the Commission charged all of these companies with violating the registration and antifraud provisions of the securities laws in connection with the Currency Program scheme.  The Court placed all of these entities under the control of the Court-appointed Receiver.  Beckman has represented at various times that he is an owner of Oxford Global Advisors, with an ownership percentage of up to 96%.

32.     **Crown Forex, S.A.** was a foreign currency trading firm based in Switzerland.  In December 2008, the Swiss Financial Market Supervisory Authority ("FINMA"), the Swiss government's financial market regulator, put the company under the Swiss equivalent of a receivership.  In May 2009, Crown Forex, S.A. was formally declared bankrupt by FINMA and is no longer operating.

33.     **Crown Forex, LLC** was an unregistered shell company whose only form of existence was as a name on a U.S.-based bank account.  The sole purpose of the Crown Forex, LLC bank account was to dupe investors into believing that their funds were being sent to Switzerland and deposited with Crown Forex, S.A.  The Commission charged Crown Forex, LLC as a relief defendant in its Complaint on November 23, 2009. The Court subsequently placed Crown Forex, LLC under the control of the Court-appointed Receiver.

## THE CURRENCY PROGRAM

### Overview

34.     From 2006 through mid-2009, Beckman and Oxford PCG advised clients

on possible investments in equity markets. Beckman also used Oxford PCG as a platform for raising funds for the Currency Program.

35.     The Currency Program was a scheme for selling investments in a purported foreign currency trading venture.

36.     The investments that Beckman and Oxford PCG offered and sold in the Currency Program were securities in the form of investment contracts.

37.     Beckman and Oxford PCG represented to prospective investors that the Currency Program employed an arbitrage strategy and took advantage of differences in the interest rates of foreign currencies. The strategy allegedly involved investing in a long position in one currency pair and an offsetting short position in a second currency pair. The strategy allegedly generated profits because one position would earn interest, and the other position would pay less interest. That is, one position allegedly earned more interest than the other position paid. The strategy allegedly was risk-free because the long position and the short position would offset each other. According to the scheme, investors could take advantage of disparities in interest rates in foreign currencies and reap substantial, guaranteed profits. The Currency Program was, in truth, a fraud.

38.     A brochure for the Currency Program explained the strategy as follows: "The funds are invested in a cross currency pair, utilizing the major G-5 countries. (ie. US Dollar, Japanese Yen, Swiss Franc, British Pound and the Euro) The strategy employs taking advantage of the interest rate difference that is being set by each Central Bank. The highest yielding currency is held long versus the lowest yielding currency

being held short.  The utilization of both our exclusive technology and unparalleled banking relationships negate all currency risks."

39.     Under the Currency Program, the investors contributed funds to a common enterprise.  The investors expected to earn profits from foreign currency trading by others.

40.     The investors' profits were tied to the efforts and success of Beckman and Oxford PCG, and to the success of the Currency Program as a whole.  The profits of the investors and the Defendants were linked because both depended on the success of the foreign currency trading.

41.     In return for Oxford PCG's advice about non-Currency Program investments, the clients paid annual fees ranging from approximately 0.85% to 1.5% of the net market value of their accounts.  Each client signed an "Investment Management Agreement" with Oxford PCG which documented these terms.  Under the Investment Management Agreement, Oxford PCG had full discretion over the client's assets. Beckman signed the Investment Management Agreement on behalf of Oxford PCG.

42.     Beckman and Oxford PCG promoted the Currency Program.  Beckman and Oxford PCG encouraged clients and potential clients to invest in the Currency Program.  Beckman and Oxford PCG offered and sold investments in the Currency Program from at least August 2006 to July 2009.

43.     Beckman and Oxford PCG raised at least $47.3 million for the Currency Program from at least 143 investors residing in numerous states.

44.     Beckman raised money for the Currency Program directly and through

agents working on his behalf through Oxford PCG.

45.     Beckman solicited investments in the Currency Program through his sales agents, information sessions at his offices, internet-based investment adviser referral services, and word-of-mouth.

46.     Many of the investors from whom Beckman raised money for the Currency Program were clients of Oxford PCG.  Other prospective investors were not yet clients of Oxford PCG.

47.     Currency Program investors, including the clients of Beckman and Oxford PCG, typically executed separate agreements with one of several entities that issued investments in the Currency Program, including UBS Diversified Growth, LLC ("UBS Diversified"), Universal Brokerage FX Management, LLC ("Universal Brokerage"), Oxford Global Advisors, LLC ("Oxford Global Advisors"), and Oxford Global Partners, LLC ("Oxford Global Partners") (the "Currency Program Agreements").

48.     During the period of the Currency Program offering, the Oxford PCG website touted that the firm "provides professional money management focused on capital preservation and superior long-term returns" and that its "investment philosophy is as progressive as it is conservative."  The website also prominently stated that Oxford PCG was an "SEC registered investment adviser."

### The Universal and Oxford Offerings

49.     From approximately August 2006 to approximately October 2007, Beckman and his agents at Oxford PCG sold Currency Program investments issued by UBS Diversified Growth and Universal Brokerage FX Management (the "Universal

entities"). The principals of the Universal entities were Trevor Cook and Patrick Kiley.

50.     In approximately October 2007, Beckman generally stopped soliciting investors to invest in the Currency Program through the Universal offerings. He began to solicit investors on behalf of Oxford Global Advisors and, later, on behalf of Oxford Global Partners (collectively, the "Oxford entities"). Beckman and Cook stopped raising money for the Currency Program through the Universal entities because UBS, AG, the global financial services firm, filed a trademark infringement lawsuit against Cook, Kiley and others for using the name "UBS."

51.     Beckman, Cook and two of their associates formed Oxford Global Advisors and Oxford Global Partners. Cook, Beckman, and their associates gave a veneer of credibility to the Currency Program by associating it with Beckman's registered investment advisory firm and sharing the "Oxford" name.

52.     After Beckman and Cook formed the Oxford entities, Beckman increased his role in managing the Currency Program.

53.     On or about June, 2007, Beckman moved the Oxford PCG offices into the Van Dusen mansion in Minneapolis, where Cook and the Oxford entities' staff worked. There, Beckman interacted with Cook and the staff of the Oxford entities on a daily basis.

54.     Beckman shared managerial control over the Currency Program with Cook and a few other associates.

55.     Beckman attended and spoke at staff sales meetings regarding raising funds for the Currency Program. He also attended and spoke at seminars given to prospective investors about the Currency Program.

56.     Beckman sent and received internal emails regarding the inner-workings of the Currency Program.

57.     Beckman exercised managerial control over employees who worked in the Currency Program.

58.     Beckman also was a signatory on several bank and foreign currency trading accounts that were used to operate the Currency Program.

59.     Relief Defendant Hollie Beckman was also a signatory on several accounts into which funds were deposited from entities receiving investor funds.

60.     From August 2006 through the present, Beckman and/or Hollie Beckman had access to, and effectuated transactions in, the following accounts into which investor funds were deposited:

(a)     Wells Fargo Bank account no. XXX-5572 in the name of Oxford FX Growth, LP;

(b)     Wells Fargo Bank account nos. XXX-5598, XXX-5606, and #XXX-5614 in the name of Oxford Global Advisors, LLC;

(c)     Voyager Bank account no. XXX-5289 in the name of Oxford Global Advisors, LLC;

(d)     Wells Fargo Bank account no. XXX-5580 in the name of Oxford Global Holdings, LLC;

(e)     Associated Bank account nos. XXX-1812 and XXX-1838 in the name of Oxford Global Investments, Inc.;

(f)     Associated Bank account no. XXX-2356 in the name of Oxford Global Partners, LLC;

(g)     Wells Fargo Bank account nos. XXX-5689 and XXX-7077 in the name of Oxford Private Client Group, LLC;

(h)     Voyager Bank account no. XXX-9222 in the name of Oxford Private Client Group, LLC;

(i)     Western International account no. XXX-6280 in the name of Oxford Private Client Group, LLC;

(j)     Voyager Bank account no. XXX-5115 in the name of BH Beckman Family, LLC;

(k)     Wells Fargo Bank account no. XXX-8793 in the name of Jason and Hollie Beckman;

(l)     Western International account no. XXX-6300 in the name of Jason and Hollie Beckman;

(m)     Newedge Group (UK Branch) account no. XXX-G058 in the name of Oxford FX Growth, LP;

(n)     Saxo Bank account no. XXX-9993 in the name of Oxford FX Growth LP; and

(o)     PFG Best in the name of Oxford FX Growth, LP.

61.     Once he created the Oxford entities, Beckman and Oxford PCG stepped up their efforts to solicit investors of Oxford PCG to invest in the Currency Program.

62.     Beckman told investors that, because the equity markets were performing poorly, they should move their money into the Currency Program because of its safety and higher rate of return.

63.     Many of the investors did not understand the Currency Program.  But they invested anyway, because they trusted Beckman.  They put their faith in Beckman and Oxford PCG.  Some investors entrusted Beckman with their life savings.

## The Misrepresentations to Investors

64.     Beckman and Oxford PCG cultivated trust in investors.  That trust was betrayed.

65.     Beckman and Oxford PCG knowingly, or with severe recklessness, made material misrepresentations and omitted to state material facts about the Currency Program.  They misrepresented, among other things, the use of investor funds, the risks of investing in the Currency Program, the ability to withdraw funds, and the profitability of the Currency Program.  In short, Beckman and Oxford PCG induced investors into the Currency Program, and did so through false pretenses.

66.     Beckman and his agents at Oxford PCG represented to investors that their money would be invested in a foreign currency trading program.

67.     That representation was false.  The Currency Program was not a legitimate currency-trading venture.  Instead, the Currency Program was a Ponzi scheme. A significant portion of the funds from investors, including investors of Beckman and Oxford PCG, was not used in foreign currency trading at all.  Instead, the funds were

used to make purported interest and return-of-principal payments to other investors, and were diverted to Cook, Kiley and the Beckmans, among other uses.

68.     Beckman and his agents at Oxford PCG represented to investors that their funds would be placed in segregated accounts.

69.     That representation was false.  The investors' funds were not placed in segregated accounts for individual investors at banks or trading firms.  In reality, the investors' funds were pooled together in bank and foreign currency trading accounts in the name of the Universal and Oxford entities.  The foreign currency trading accounts included some accounts for which Beckman was a signatory (and, in some cases, the sole signatory).

70.     Beckman and his agents at Oxford PCG represented to investors that the Currency Program would generate profits, and that their funds would earn returns ranging from 10.5% to 12%.

71.     That representation was false.  The Currency Program never yielded profits of 10.5% to 12%.  There was no basis for such a guarantee.

72.     Beckman and his agents at Oxford PCG represented to investors that investments in the Currency Program involved little to no risk.

73.     That representation was false.  All investor funds were at risk because their principal investment was used to pay other investors, or was otherwise misappropriated.  A significant portion of the funds was not sent to foreign currency trading firms at all.  The trading that did take place was high-risk and sustained huge losses.

74.     Beckman and his agents at Oxford PCG represented to investors that investments in the Currency Program were liquid and could be withdrawn at any time.

75.     That representation was false.  When the fraud collapsed, investors suffered enormous losses and were unable to withdraw their funds.

76.      Beckman told some investors that he was personally trading the foreign currencies.

77.     That representation was false.  Beckman did not, in fact, direct the foreign currency trading for the Currency Program.

78.     Beckman and his agents' explanations as to how the Currency Program worked varied, but generally they represented to investors that it employed an arbitrage strategy that took advantage of differences in the interest rates of different foreign currencies.  They generally told investors that the trading strategy involved investing in a long position in one currency pair and an offsetting short position in the same currency pair.  According to Beckman and his agents, because the positions offset, there was purportedly no currency fluctuation risk, no market exposure, and no risk to the investor's principal.  Those representations were false.

79.     Beckman and his agents at Oxford PCG represented to investors that even though the positions offset, the trading strategy could realize a profit because the account containing the long currency pair position collected more interest than the interest paid by the account containing the short currency pair position.  They represented to some investors that the strategy utilized a trading firm that complied with Shariah (Islamic) law and therefore did not require interest payments to establish a short position.  They

represented that this gave them the opportunity to earn a greater profit while maintaining a fully hedged trading position.  Those representations were false.

80.     Beckman and his agents at Oxford PCG distributed written marketing materials to investors.

81.     One of the documents provided to investors by Beckman and Oxford PCG represented that the Currency Program was paying an "annualized rate of 12%." The promotional literature represented that client funds were "instantly liquid," and were maintained in a "segregated account, not-comingled with the general assets of the custodian, bank, or dealer."  The promotional material cited a strategy to "provide you with consistent and predictable income and the safety of principal you desire."  The brochure added that the goal was to "employ low to no risk of capital strategies," while "[a]t the same time significantly outperforming comparable investment products."  Those representations were false.

82.     The Oxford PCG website touted that its portfolio had "outperformed the S&P 500 for seven consecutive years."  That representation was false.

83.     On the Oxford PCG website and in newsletters distributed to clients, Beckman boasted that he "ranks as one of the top portfolio managers in the U.S. based on a Morningstar comparative study."  That representation was false.

84.     Oxford PCG also placed advertisements in SFO [Stocks, Futures and Options] Magazine.  The advertisements were submitted to SFO Magazine by an Oxford PCG representative from an Oxford PCG email account.  The advertisements promoted

Oxford PCG by pointing readers to its website, and also promoted Oxford Global Advisors and Oxford Global Partners.

85.     Several of the advertisements claimed that they had outperformed the S&P 500 from 2002-2007 or 2002-2008.  An advertisement by Oxford PCG and Oxford Global Partners suggested that they had offices in "Miami," "Geneva," "Dubai," "London," "Singapore," and "Copenhagen."  The advertisements cited their commitment to "Risk Management," promoted their "low risk" approach, and reinforced the need to "minimize downside risk in a bear market."  One Oxford PCG advertisement appealed to the reader's trust:  "Trust an advisor who knows how to protect your assets in good times and bad."  Those representations were false.

86.     Beckman failed to disclose to investors in the Currency Program that he had an ownership interest in Oxford Global Advisors.  His ownership in Oxford Global Advisors posed a conflict-of-interest because Beckman stood to profit from the revenue of Oxford Global Advisors.

87.     Beckman also failed to disclose to investors that he had a personal financial incentive to recommend investments in the Currency Program.  Beckman and Oxford PCG received payments from Oxford Global Advisors and Oxford Global Partners for raising funds for the Currency Program.  He never disclosed such a conflict-of-interest to investors.

## The Currency Program Agreements

88.     Beckman and Oxford PCG had investors sign Currency Program Agreements, at first with Universal and later with Oxford Global Advisors.

89.     The Currency Program Agreements gave Universal or Oxford Global Advisors discretion to trade investor funds in several types of investments, including certain securities.

90.     Some investors elected to receive monthly payments of the purported returns while the majority of investors chose to reinvest their returns.

91.     The Currency Program Agreements represented that investors would be assessed various fees including a deferred sales charge for withdrawals made within the first four years of the investments, a "management fee" equal to 1.5% to 2% of the assets invested, and a "performance fee" equal to 20% of the profits generated on the investment, and/or a "contingent deferred sales charge."

92.     Beckman's representations regarding his compensation varied.  Beckman told some investors that he received a percentage of the currency trading profits as compensation.  Beckman told other investors nothing about his compensation.  Beckman explained to the staff of the Commission that Cook paid him commissions or "rebates" of 4% of the principal that his investors contributed to the Currency Program.  Beckman did not disclose the commissions or rebates to many of the investors.

**The Money Flow**

93.     At first, Beckman instructed investors to write a check payable to "UBS" or "UBS Diversified."   Later, he instructed investors to write checks or wire money to Oxford Global Advisors.  Investors who wrote checks gave them to Beckman or his agents at Oxford PCG, who then deposited the checks into accounts in the name of one of the Universal entities or Oxford Global Advisors.

94.      The investors' funds were commingled with funds from other Currency Program investors.

95.      Account statements sent to investors did not show that the investors' funds were pooled.  Instead, the account statements stated that funds were placed in individual accounts, with unique account numbers, belonging to each investor.

96.      From approximately November 2007 through approximately January 2009, investors in the Currency Program received account statements in the mail.  Each statement showed that the investor had an individual account number.  These one-page statements included the amount purportedly earned during the month covered by the statement and the current account balance.  The statements indicated that investors earned profits from the currency trading.

97.      The account statements were a fraud.  The account statements did not reflect real-world profits from currency trading.  Instead, Beckman's assistant at Oxford PCG merely calculated the purported "profits" by multiplying the amount of the investment by the guaranteed rate of return.  The "profits" existed only on paper.  The individual account numbers also gave the false impression that each investor's money was held in a segregated account.

98.      Beckman was ultimately responsible for the preparation of the account statements.  The statements were prepared by Beckman's assistant, under Beckman's direction.  The statements also invited investors to "PLEASE CONTACT BO BECKMAN . . . WITH QUESTIONS."

99.     Beckman supervised the preparation of the account statements.  Beckman also personally made changes to the account statements during the drafting process. Beckman directed an employee of Oxford PCG to insert language in the account statements, asking investors to call "Bo Beckman or Chris Pettengill" with any questions.

### The Transition to Crown Forex, S.A.

100.    Beginning in July or August 2008, Beckman and Oxford PCG started telling at least some new and existing investors of significant changes to the Currency Program.

101.    Beckman and Oxford PCG told at least some investors that Crown Forex, S.A., a foreign currency trading firm located in Switzerland, would invest their funds on a going-forward basis.

102.    Beckman and Oxford PCG told at least some investors that Crown Forex, S.A. would take over for Oxford Global Advisors as the custodian of their funds, but that Oxford Global Advisors would continue to manage the trading.

103.    Beckman and Oxford PCG informed at least some investors that if they desired to remain invested in the Currency Program, their funds would be transferred to Crown Forex, S.A. in Switzerland.

104.    Beckman and Oxford PCG instructed investors to complete a Crown Forex, S.A. account-opening application, as well as an Oxford Global Advisors account-management agreement.

105.    Beckman testified before the Commission that he learned by April, 2008 that investors' funds were not segregated in separate accounts, but rather were pooled

together.  That is, he knew that the Currency Program involved the commingling of funds, contrary to his representations to investors.

106.     The pooling of investor funds was a red flag that the Currency Program was a fraud.  Yet Beckman and Oxford PCG continuing raising funds for the Currency Program.

107.     Beckman and his agents at Oxford PCG instructed new investors to make their checks out to "Crown" or "Crown Forex."

108.     The investors' funds, however, were not sent to Crown Forex S.A. in Switzerland.  Instead, they were deposited into a Minneapolis bank account belonging to a U.S. company named "Crown Forex, LLC."

109.     Crown Forex, LLC was an unregistered shell company whose only purpose was to serve as the name on a Minneapolis bank account.  The use of the name "Crown Forex" was a ruse.  The use of the name "Crown Forex" gave investors the false impression that their funds would be sent to Switzerland for foreign currency trading by Crown Forex, S.A.

110.     Only $23 million (approximately) of the investors' funds were ever sent to Crown Forex S.A. in Switzerland.  Approximately $3 million was for an equity investment in Crown Forex S.A.

111.     Beckman knew or should have known that investor funds were, in reality, deposited in a Minneapolis bank account under the name Crown Forex, LLC.

112.     Beckman knew or should have known that Kiley and Cook controlled the Minneapolis bank account in the name of Crown Forex, LLC.

113.     Beckman knew or should have known that the investors' money was not being sent to Switzerland.

114.     The individual Currency Program investors did not have any accounts with Crown Forex, S.A. in Switzerland.

115.     Virtually all the investors' money was deposited in a Minnesota account, not with Crown Forex, S.A. in Switzerland.

116.     Investors' funds were commingled in a Minnesota bank account in the name of "Crown Forex, LLC."

117.     Beckman and his agents at Oxford PCG also told investors that the way they received account statements would change.  They told investors to access their account statements on-line, directly from their new custodian, Crown Forex, S.A.

118.     The on-line account statements purported to show that each investor's funds were held in a segregated account with Crown Forex, S.A.

119.     The on-line account statements also purported to show that each investor's account was making daily profits from currency trading at Crown Forex, S.A.  The statements did not show any trading losses.  The on-line account statements gave a false sense of security to investors, representing that they had earned steady, significant profits.

120.     The on-line account statements were a fraud.  They did not reflect real-world profits from real-world foreign currency trading.  The account statements gave investors the false impression that their funds were performing well.  In reality, their funds were lost in high-risk trading, or misappropriated, or returned to other investors.

**Beckman's Awareness of Significant Problems**

121.     Beckman was in a position to know that the Currency Program was a scam and a hoax.  He had a front-row seat at the epicenter of the fraud.

122.     Beckman worked from Oxford PCG offices in the Van Dusen mansion in Minneapolis, working with Cook and his staff on a daily basis.  He shared managerial control over the operation of the Currency Program.  He had access to bank records and other financial information.  He attended and participated in promotional meetings with investors.  He was familiar with promotional literature about the Currency Program, and he distributed that information to potential investors.  He hired and fired personnel of Oxford Global Advisors.  He was in a position to know the truth about the Currency Program.

123.     Beckman was a licensed securities professional with experience in the securities industry.  He was associated with a broker-dealer and an investment adviser, both of which were registered with the Commission.  Yet he represented to investors that the Currency Program would produce guaranteed returns ranging from 10.5% to 12% per year – with little or no risk – and that the investments would be liquid.  Based on his experience, Beckman was in a position to know better.

124.     Beckman did not conduct adequate due diligence to support his representations to investors about the Currency Program.

125.     Beckman had access to bank and trading records that, if examined, would have revealed that the Currency Program was a fraud.  He was in a position to see red flags about the Currency Program.  Yet Beckman either knew the truth about the program

or recklessly closed his eyes to the fraud.

126.     Beginning in early 2008, if not before, Beckman came to believe that the other principals of Oxford Global Advisors were not being truthful with him about Oxford Global Advisors' finances.  Beckman testified during the Commission's investigation that he believed that Cook was cheating him by depriving him of his fair share of the revenue.

127.     Beckman testified during the Commission's investigation that he investigated the accuracy of the financial statements of Oxford Global Advisors from February or March 2008 through the end of 2008.

128.     Beckman testified during the Commission's investigation that he thought that the financial statements of Oxford Global Advisors were an "absolute mess."  He testified that he told Cook that there were problems with the financial statements, and did so "a lot."  He testified that Cook never gave him a satisfactory answer about the accuracy of the financial statements of Oxford Global Advisors.  He testified that he had requested, but never received, supporting financial information that was satisfactory.

129.     Beckman testified during the Commission's investigation that he was "never 100% comfortable with any of" Oxford Global Advisors' principals.  He testified that he "never gained confidence regarding being in business" with Cook and two of Cook's associates.

130.     Beckman did not disclose to investors that he had doubts about the truthfulness of Cook.   Beckman also did not disclose to investors that he had doubts about the accuracy of the financial statements of Oxford Global Advisors.

131.    Despite his doubts, Beckman continued to solicit investors to invest in the Currency Program.  He continued to send millions of dollars of client funds to entities connected to Cook – even though he allegedly did not trust him.

132.    In approximately March 2008, Beckman directed attorneys to investigate how Oxford Global Advisors was generating revenue and how much money the other principals of Oxford Global Advisors were paying themselves.  The review of the Currency Program by legal counsel continued in 2008.

133.    Beckman admitted in his testimony before the Commission that the attorneys' investigation did not answer his questions.  Yet he continued to solicit investors to invest in the Currency Program.  After March 2008, Beckman and his agents at Oxford PCG raised approximately $24.4 million for the Currency Program.

134.    Beckman did not disclose to investors that attorneys were investigating the Currency Program.

135.    Then, in approximately June 2008, a nationally prominent accounting firm conducted a review of the Currency Program.  The accounting firm experienced significant problems reconciling the Currency Program's account statements with actual bank and trading records and was therefore unable to complete its review.

136.    Beckman testified during the Commission's investigation that the accounting firm was not able to complete its review.

137.    Beckman did not disclose to investors that a nationally prominent accounting firm had reviewed the Currency Program and was unable to complete its review.

138.     Instead, Beckman touted to at least one prospective investor that the Currency Program had been reviewed by the nationally prominent accounting firm.  That is, he referred to the examination by the accounting firm to suggest that the Currency Program had, in fact, passed independent scrutiny.

139.     Beckman testified during the Commission's investigation that he hired a technology firm to copy hard drives on computers used in the Currency Program.  He testified that he did so to "[g]et some clarity about who was telling the truth" about the finances.

140.     Beckman did not disclose to investors that he had hired a technology firm to copy hard drives of the computers.  Instead, he kept raising money.

141.     Beckman received warnings about potential illegalities in the Currency Program.

142.     In July 2008, Beckman was forwarded an email from a former sales representative that stated: "Perhaps you should remind [Beckman] that these investors put money into a commingled account against SEC regulations, developed by the Oxford and overlooked by Oxford compliance."

143.     Despite receiving this information, Beckman continued to solicit investors to invest in the Currency Program.  After July 2008, Beckman and his agents raised approximately $12.3 million for the Currency Program.

144.      Beckman did not disclose to investors that he had received an email about a "commingled account against SEC regulations."

145.     On July 29, 2008 – shortly after a review of the Currency Program by his

attorneys – Beckman temporarily halted the raising of funds.  He wrote an email to sales personnel of Oxford PCG and Oxford Global Advisors, stating:  "In case any of you missed this, I thought I would send it again.  Effective immediately:  no solicitations of the currency program are to continue until further notice.  A violation of this instruction will be deemed grounds for dismissal."

146.     The fundraising freeze was apparently short-lived.  Beckman and Oxford PCG raised almost $2 million for the Currency Program in August 2008, and raised over $1 million for the Currency Program in September 2008.

147.     In August 2008, the CEO of Western International Securities, Inc. sent an email to a representative of Oxford PCG.  At the time, Beckman was a registered representative of Western International Securities, Inc.  The CEO had learned of a link to the Currency Program on Oxford PCG's website entitled, "How's 10.5% fixed return sound?"  The CEO expressed interest in learning "more about this investment."

148.     The representative of Oxford PCG then forwarded the email to Beckman.

149.     Beckman, in turn, forwarded the CEO's email to Cook and lamented: "Now the ship begins to sink.  This is not good."

150.     Cook responded with concern:  "I am very sorry about this."  He then suggested a cover-story.  "[W]e can blame it on a trainee sales rep who was fired . . . say nothing he did was approved."  He also suggested that they could hide behind a broker-dealer ("say that Chris ran the product through the broker dealer"), and hide behind attorneys ("also say we have opinion letters from attorneys about the product").

151.     Despite his admission that "[n]ow the ship begins to sink," Beckman

continued to solicit investors to invest in the Currency Program. After August 2008, Beckman and his agents raised approximately $10.4 million for the Currency Program.

152.     Beckman received other bright-light warnings about the Currency Program. On September 30, 2008, Beckman emailed Cook, asking for the location of several investors' funds. He wrote: "I need to know where these accounts (or the money) is for the following investors and their current values: asap, thanks."

153.     Cook did not give a straight answer to this simple question. Instead, Cook replied: "This requires a meeting. I want to have plenty of time and detail out 100% of everything for you." Cook added: "This is not a black and white situation as Jerry took all of these files."

154.     Cook then flagged the possibility of illegal conduct: "[P]lease don't ever jump to any conclusions if something appears to be different or not right. . . . I was trying to keep you out of this as I didn't want to waste your time and expose you to stupid and possibly illegal s%#t Jerry has done."

155.     Beckman testified during the Commission's investigation that he never received a satisfactory answer as to what Cook meant by the statement, "[t]his is not a black and white situation."

156.     Beckman did not disclose to investors that the location of their money was "not a black and white situation."

157.     Beckman did not disclose to investors that one of his colleagues had, according to Cook, committed "possibly illegal" conduct.

158.     Nevertheless, Beckman continued to solicit investors to invest in the

Currency Program.  After September 2008, Beckman and his agents raised approximately $9.3 million for the Currency Program.

159.     In December 2008, Beckman determined that Cook and others were personally spending large sums of Oxford Global Advisors funds, despite the fact that they had told him that Oxford Global Advisors was suffering financially.

160.     Beckman did not disclose to investors that Oxford Global Advisors was suffering financially.

161.     Nevertheless, Beckman continued to solicit investors to invest in the Currency Program.

162.     In December 2008, the Swiss Financial Market Supervisory Authority ("FINMA"), the Swiss government's financial market regulator, instituted an action to investigate Crown Forex, S.A.  FINMA appointed two Swiss attorneys to conduct the investigation.

163.     Based on FINMA's investigation, on December 10, 2008, the investigators prohibited the firm from accepting new clients or honoring withdrawal requests.

164.     Beckman became aware of these facts by at least February 18, 2009, through his communications with FINMA.

165.     Despite his knowledge of FINMA's actions, Beckman continued to solicit investors to invest in the Currency Program.  After December 2008, Beckman and his agents raised approximately $3.3 million for the Currency Program.

166.    On February 23, 2009, FINMA issued a decision ordering the liquidation of Crown Forex, S.A.  Beckman became aware of FINMA's decision at or near the time that it occurred.

167.    Nevertheless, Beckman continued to solicit investors to invest in the Currency Program.  After February 2009, Beckman and his agents raised approximately $2.1 million for the Currency Program.

168.    On May 18, 2009, FINMA declared Crown Forex, S.A. to be bankrupt, finding that Crown Forex, S.A.'s liabilities (including customer liabilities) exceeded its assets by more than $10 million in Swiss Francs.  Beckman became aware of FINMA's decision at or near the time that it occurred.

169.    Beckman and Oxford PCG did not disclose to investors that Crown Forex was having problems.  They did not disclose that, in December 2008, FINMA had prohibited Crown Forex, S.A. from accepting new clients or honoring client withdrawals. They did not disclose that FINMA had ordered the liquidation of Crown Forex, S.A., or that FINMA had declared Crown Forex, S.A. bankrupt.  Instead, Beckman and Oxford PCG kept raising money for the Currency Program.

## The Misuse of Investors' Funds

170.    Members of the public invested at least $194 million in the Currency Program.

171.    Beckman and Oxford PCG raised at least $47.3 million from investors for the Currency Program.

172.     The funds from the investors of Beckman and Oxford PCG were pooled in accounts with funds of other Currency Program investors.

173.     The investors' funds were misused. The funds were used for purposes that were inconsistent with the representations of Beckman and Oxford PCG.

174.     Of the $194 million raised, only $109 million was deposited into brokerage accounts in which foreign currency trading took place. The remaining $85 million was never invested in any type of foreign currency trading.

175.     Of the $109 million deposited into brokerage accounts, approximately $35 million was returned over time to bank accounts controlled by Beckman and his associates.

176.     Cook used some of the $74 million remaining at brokerage firms for foreign currency trading. While at a few points in time Cook's trading was profitable, he generally lost money each month. Over the entire offering period, the trading sustained a net trading loss of approximately $68.3 million. Cook's trading involved significant risk and was inconsistent with the representations that Beckman and Oxford PCG had made to investors.

177.     Of the $35 million returned from the brokerage firms, plus the $85 million that was never deposited into brokerage accounts in the first place, approximately $52 million was used to pay purported returns and principal to investors.

178.     Investors solicited by Beckman and Oxford PCG invested at least $47.3 million in the Currency Program. Those investors received back payments totaling only

approximately $8.2 million.  As a group, the investors have suffered losses of at least $39.1 million.

179.    Beckman was a signatory on many of the bank and brokerage accounts through which the investors' money flowed.  Beckman authorized transactions in those accounts and received and had access to statements for the accounts.

## The Beckmans Misappropriated
## Millions of Dollars from the Investors

180.    While the investors lost, the Beckmans gained.  Millions of dollars from the investors ultimately went to Beckman or to third parties for his benefit.

181.    From September 2006 to March 2009, Beckman and Relief Defendant Hollie Beckman received approximately $7.8 million from accounts containing investor funds.

182.    From August 2006 into 2010, the Beckmans spent millions of dollars. They did so from accounts that they controlled.  Those accounts, in turn, had received funds from accounts containing commingled investor funds.  The Beckmans used those funds to finance an extravagant lifestyle, including:

(a)    $210,828 in automobile payments.  The Beckmans drove luxury vehicles during this period, including a 2010 Jaguar, a 2008 Land Rover, a 2008 Mercedes, a 2006 Land Rover, and a 2000 Mercedes.

(b)    $1,493,319 in payments for luxury homes in Minneapolis, Texas, and Florida.

(c)    $997,336 in payments to seven law firms, some of which was for the purpose of purchasing a share of the Minnesota Wild, the local NHL team.

(d)    $695,023 in credit card payments.  The purchases charged to these credit cards included $29,616 in travel, $50,925 for furniture, and $42,200 for antiques and spa equipment.

(e)    $61,446 in child support payments.

(f)    $103,872 in cash withdrawals.

(g)    $180,000 paid for a one-year membership in a suite at the Minnesota Wild professional hockey games.

(h)    $36,539 paid to resorts.

(i)    $224,801 for construction and repairs.

(j)    $233,268 in tax payments.

(k)    $76,342 in payments to a country club.

183.    In addition, accounts containing investor funds were used to pay certain expenses of Oxford PCG, as well as debit card expenses incurred by Beckman.

184.    From October 2006 to May 2009, Beckman received $511,000 from broker-dealer firms for services unrelated to the Currency Program.  He did not earn a material amount of income from any other source.

## The Fraud Collapses

185.    On June 22, 2009, the staff of the SEC conducted a surprise examination of Oxford PCG's offices and issued subpoenas to Beckman and several of his associates.

186.    Approximately two weeks later, on July 7, 2009, a group of investors filed a private action against several individuals alleging that the Currency Program was a Ponzi scheme.

187.    Shortly thereafter, the websites of the Oxford and Universal entities were taken down except for a single page.  The page stated that the entities had received subpoenas from the SEC, that they were no longer raising investor funds, and that Crown Forex, S.A. was involved in a bankruptcy proceeding.  From that point forward, no additional funds were raised from investors.

188.    After the scheme collapsed, Beckman attempted to portray himself as a victim.  He claimed that he personally suffered significant losses in the Currency Program.  That, too, was false and misleading.

## COUNT I

### Violations of Section 5(a) and (c) of the Securities Act
### [15 U.S.C. § 77e(a) and (c)]
### (Against Beckman and Oxford PCG)

189.    Paragraphs 1 through 188 above are realleged and incorporated herein by reference as though fully set forth herein.

190.    By engaging in the conduct described above, Beckman and Oxford PCG, directly or indirectly:  (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of

transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

191.     No valid registration statement was filed or was in effect with the Commission in connection with the offer and sale by Beckman and Oxford PCG of interests in the Currency Program.

192.     By reason of the foregoing, Beckman and Oxford PCG have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] (Against Beckman and Oxford PCG)

193.     Paragraphs 1 through 188 are realleged and incorporated by reference as though fully set forth herein.

194.     By engaging in the conduct described above, Beckman and Oxford PCG, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

195.     Beckman and Oxford PCG acted with scienter.

196.     By reason of the foregoing, Beckman and Oxford PCG violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

**Violations of Sections 17(a)(2) and (3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and (3)]**
**(Against Beckman and Oxford PCG)**

197.    Paragraphs 1 through 188 are realleged and incorporated by reference as though fully set forth herein.

198.    By engaging in the conduct described above, Beckman and Oxford PCG, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

a.    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.    engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

199.    By reason of the foregoing, Beckman and Oxford PCG have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Against Beckman and Oxford PCG)

200.     Paragraphs 1 through 188 are realleged and incorporated by reference as though fully set forth herein.

201.     By engaging in the conduct described above, Beckman and Oxford PCG, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon any person.

202.     Beckman and Oxford PCG acted with scienter.

203.     By reason of the foregoing, Beckman and Oxford PCG violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT V

### Violations of Section 206(1) of the Advisers Act
### [15 U.S.C. § 80b-6(1)]
### (Against Beckman and Oxford PCG)

204.     Paragraphs 1 through 188 above are re-alleged and incorporated herein by reference.

205.     At all relevant times, Beckman and Oxford PCG acted as investment advisers.  Beckman and Oxford PCG managed the investments of clients in exchange for compensation in the form of fees.

206.     Beckman and Oxford PCG, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly employed devices, schemes or artifices to defraud their clients or prospective clients.

207.     Beckman and Oxford PCG knowingly or recklessly engaged in the fraudulent conduct described above.

208.     By engaging in the conduct described above, Beckman and Oxford PCG violated Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VI

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]
### (Against Beckman and Oxford PCG)

209.     Paragraphs 1 through 188 above are re-alleged and incorporated herein by reference.

210.    At all relevant times, Beckman and Oxford PCG acted as investment advisers.  Beckman and Oxford PCG managed the investments of clients in exchange for compensation in the form of fees.

211.    Beckman and Oxford PCG, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

212.    By engaging in the conduct described above, Beckman and Oxford PCG violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VII

### (Against Relief Defendant Hollie Beckman)

213.    Paragraphs 1 through 188 are realleged and incorporated by reference.

214.    At least $7.8 million was transferred from accounts in which funds illegally obtained from investors had been commingled, to accounts controlled by Relief Defendant Hollie Beckman or accounts for her benefit.

215.    The monies received by the Relief Defendant Hollie Beckman, as alleged above, constituted ill-gotten gains from the fraud of others.

216.    Relief Defendant Hollie Beckman has no legitimate claim to the ill-gotten funds she received as a result of the fraud of others or to any assets that were acquired with those ill-gotten funds.

CASE 0:11-cv-00574-MJD -FLN Document 1 Filed 03/07/11 Page 42 of 44

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants Beckman and Oxford PCG committed the violations charged and alleged herein.

### II.

Grant Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendants Beckman and Oxford PCG, their agents, servants, employees, independent contractors, attorneys and those persons in active concert or participation with him who receive actual notice of the Orders, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j], Rule 10b-5 thereunder [17 CFR § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

### III.

Issue an Order requiring the Defendants, jointly and severally, and the Relief Defendant to disgorge the ill-gotten gains that they received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to the violative acts, practices and courses of business set forth herein, issue an Order imposing upon Defendants Beckman and Oxford PCG appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant appropriate emergency relief to prevent further secretion or dissipation of assets purchased with investor funds.

## VII.

Grant an Order for any other relief this Court deems appropriate.

Respectfully submitted,

Dated: March 7, 2011

s/ Steven C. Seeger
John E. Birkenheier
Adolph J. Dean, Jr.
Steven L. Klawans
Steven C. Seeger (IL #6243849)
Justin M. Delfino
Attorneys for Plaintiff
U.S. Securities and Exchange
Commission
Chicago Regional Office
175 West Jackson Blvd.
Suite 900
Chicago, Illinois 60604
T. 312-353-7390
F. 312-353-7398
birkenheierj@sec.gov
deana@sec.gov
klawanss@sec.gov
seegers@sec.gov
delfinoj@sec.gov


James Alexander
Assistant United States Attorney
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN
T. 612-664-5600
F. 612-664-5788
Local Counsel