## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

———————————————————————  :

**UNITED STATES SECURITIES**                         :
**AND EXCHANGE COMMISSION**,                    :
                                                                              :
         **Plaintiff,**                                              :
                                                                              :
**v.**                                                                     :         **Civil Action No.**
                                                                              :
**JASON BO-ALAN BECKMAN and**              :
**THE OXFORD PRIVATE CLIENT**               :
**GROUP, LLC,**                                             :
                                                                              :
         **Defendants,**                                       :
                                                                              :
         **and**                                                       :
                                                                              :
**HOLLIE BECKMAN,**                                  :
                                                                              :
         **Relief Defendant.**                             :
———————————————————————:


## MEMORANDUM IN SUPPORT OF
## UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
## MOTION FOR AN ASSET FREEZE, APPOINTMENT OF A RECEIVER,
## <u>PRELIMINARY INJUNCTION, AND OTHER ANCILLARY RELIEF</u>

**Table of Contents**

**FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Overview of Beckman, Oxford PCG, and the Currency Program . . . . . . . . . . . 3

    Bating the Hook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Mum's the Word . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Red Flags . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    The False Assurances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    The Transfer of Wealth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**I.**      **Beckman and Oxford PCG Violated the Federal Securities Laws.** . . . . . . . 20

    A.     Beckman and Oxford PCG Violated Section 17(a) of the
            Securities Act, Section 10(b) of the Exchange Act, and
            Rule 10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.     Beckman and Oxford PCG Violated Sections 206(1)
            and 206(2) of the Investment Advisers Act of 1940. . . . . . . . . . . . . . . . . 23

    C.     Beckman and Oxford PCG Violated Sections 5(a)
            and 5(c) of the Securities Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**II.**      **This Court Should Preserve and Protect the Status Quo
         by Ordering an Asset Freeze and Granting Other Relief.** . . . . . . . . . . . . . . 27

    A.     An Asset Freeze Is Necessary and Appropriate. . . . . . . . . . . . . . . . . . . . . 27

    B.     A Repatriation Order Is Necessary and Appropriate. . . . . . . . . . . . . . . . 28

    C.     An Order Requiring an Accounting Is Necessary and Appropriate. . . . . . 29

    D.     A Document-Preservation Order Is Necessary and Appropriate. . . . . . . . 30

    E.     A Discovery Order Is Necessary and Appropriate. . . . . . . . . . . . . . . . . . 30

F.      Other Relief Is Necessary and Appropriate. . . . . . . . . . . . . . . . . . . . . . . 31

**III.   This Court Should Appoint a Receiver.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**IV.   This Court Should Issue a Preliminary Injunction.** . . . . . . . . . . . . . . . . . . . 32

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Jason Bo-Alan Beckman was one of the ringleaders of the Currency Program, a foreign currency trading scam orchestrated by and with Trevor Cook. Beckman lured members of the public into investing their hard-earned money into the scheme by making extravagant promises. He represented that their funds would be used exclusively for foreign currency trading, and that the trading would generate consistent, significant profits. He promised high returns, liquidity, safety, and segregated accounts. He was adept at convincing others to part with their money, raising over $47 million from 143 investors who put their trust in him.

That trust was ill-placed. The Currency Program was not a legitimate foreign currency trading program at all. Instead, it was a Ponzi scheme. The funds were not segregated, and the "profits" were not real. The funds of investors went to other investors, or were lost in high-risk trading, or were misappropriated by Beckman and his cohorts. Beckman's investors ultimately lost over $39 million by investing in the Currency Program and putting their money in his hands.

Beckman was in a position to know the truth about the Currency Program. He worked side-by-side with Trevor Cook at the Van Dusen mansion. Red flags waved all around him. For example, he knew – by April 2008, over a year before the scheme collapsed – that investors' funds were pooled and were not in segregated accounts at all. He also learned from Trevor Cook that the location of investors' funds was "not a black and white situation." The warning signs were glaring. Yet Beckman kept quiet – and kept taking tens of millions of dollars from investors.

Unlike his investors, Beckman reaped huge pay-outs from the Currency Program. Beckman and his wife extracted over $7.8 million from accounts containing investor funds. They used investor funds to finance a high-end lifestyle, purchasing extravagant homes, luxury vehicles, world travel, antiques, spa treatments, country-club memberships, and a suite at professional hockey games.

Now that the Currency Program is over – and the money flow has stopped – the Beckmans apparently are struggling to make ends meet. Their expansive home in the Minneapolis suburbs is in foreclosure. It is scheduled to be sold by the Sheriff on ***March 14, 2011***. Absent Court intervention, equity in that home could slip away.

This Court should put a halt to that sale and grant other immediate relief. This Court should freeze all of the assets of Beckman, Hollie Beckman, and Oxford Private Client Group, and preserve the remaining value for investors. This Court also should direct Beckman to provide a sworn accounting, require him to answer questions, and prohibit him from destroying evidence. This Court also should appoint a Receiver and direct him to take appropriate action. Finally, this Court should enjoin Beckman and Oxford PCG from committing future violations of the federal securities laws. Such relief is only a start, but it is a constructive first step toward holding Beckman accountable for defrauding investors.

## FACTS

### Overview of Beckman, Oxford PCG, and the Currency Program

Beckman is the owner and principal of Oxford PCG, an investment advisory firm registered with the Commission.  Oxford PCG is in the business of advising others, for compensation, about investments in securities.  *See* Aguilar Decl., Ex. 12, 16.

There is no doubt that Beckman is fully in charge of Oxford PCG.  *See* Aguilar Decl., Ex. 6 (10/12/10 Beckman testimony, at 59:25-61:17, 62:11-63:3, 71:2-11).  He manages the business and affairs of Oxford PCG and makes all of its investment decisions.  *Id.*  His titles at Oxford PCG have included senior portfolio manager, managing director, and chief investment officer.  *Id.*  Beckman has represented in filings with the Commission that he is the 100% owner of Oxford PCG.

In August, 2006, Beckman began raising funds for the Currency Program.  *See* Aguilar Decl., Ex. 2, Attachment A.  The Currency Program was a scheme for selling investments in a purported foreign currency trading venture.  Beckman and Oxford PCG represented to prospective investors that the Currency Program employed an arbitrage strategy and took advantage of differences in the interest rates of foreign currencies.  *See, e.g.,* Aguilar Decl., Ex. 18.  In reality, the Currency Program was a fraud.

Beckman joined forces with Trevor Cook, and promoted the Currency Program as a safe, reliable investment.  Trevor Cook is currently serving a 25-year sentence for his role in the Currency Program.

Beckman played a pivotal role in managing the Currency Program.  *See* Aguilar Decl., Ex. 8 (11-17-10 Moeller testimony at 95:3-97:22).  Beckman, Cook and two of

their associates formed Oxford Global Advisors and Oxford Global Partners, and used those entities as vehicles for raising money.  Beckman believed that he gained an ownership interest in Oxford Global Advisors, and he acted accordingly.  He managed employees, hired and fired personnel, and controlled certain bank accounts.

By June 2007, Beckman moved the offices of Oxford PCG into the Van Dusen mansion, and worked side-by-side with Cook and his staff on a daily basis.  He had a front-row seat at the epicenter of the fraud.

### Bating the Hook

Beckman had a financial incentive to raise funds for the Currency Program.  He told investors that he would receive a percentage of the overall profits from the foreign currency trading.  *See, e.g.,* Abrahamson Decl. ¶ 22; Paige Decl. ¶ 12; *see also* Aguilar Decl., Ex. 18, at 3 (discussing a 1.5% fee).  But he also received payments on the side. He received rebates from Oxford Global Advisors and expected to receive a cut of its revenues – a conflict of interest that he did not disclose to investors.  *See* Abrahamson Decl. ¶ 38; Hill Decl. ¶ 28; Paige Decl. ¶ 23.  He also had access to bank accounts containing investor funds, and he used that access to misappropriate millions of dollars for personal gain.  *See* Aguilar Decl. ¶ 23.  The calculus was simple:  the more money that he raised, the more money that he made – and the more that he could take.  *See* Aguilar Decl., Ex. 6 (10/12/10 Beckman testimony at 172:23-173:8).

Beckman pursued the fundraising with great vigor.  He met one-on-one with prospective investors, developing a personal, trusting relationship.  *See, e.g.,* Abrahamson Decl. ¶¶ 5, 10; Hill Decl. ¶¶ 3-6, 36; Paige Decl. ¶ 4.  He spoke at seminars with

4

prospective investors, gave his best sales pitch, and distributed glossy brochures.  *See* Aguilar Decl., Ex. 18; Hill Decl., Ex. A; Paige Decl., Ex. B.  Beckman proved to be adept at luring money from other people.  In only a few short years, Beckman and his agents at Oxford PCG raised approximately $47.3 million for the Currency Program.  *See* Aguilar Decl. ¶ 13.

The secret to Beckman's success was, unfortunately, fraud and deceit.  Beckman and Oxford PCG told a series of lies and half-truths about the Currency Program.  He represented that the funds would be used exclusively for foreign currency trading.  *See* Abrahamson Decl. ¶ 10; Hill Decl. ¶ 9; Paige Decl. ¶ 7.  He represented that the funds would remain in segregated accounts.  *See* Abrahamson Decl. ¶ 11; Hill Decl. ¶ 10; Paige Decl. ¶ 8.  He represented that the Currency Program would lead to double-digit profits – *guaranteed*.  *See* Abrahamson Decl. ¶ 12; Hill Decl. ¶ 11; Paige Decl. ¶ 9.  He represented that the investment involved little or no risk.  *See* Abrahamson Decl. ¶ 13; Hill Decl. ¶ 12; Paige Decl. ¶ 10.  And he represented that their funds would be liquid and could be withdrawn at any time.  *See* Abrahamson Decl. ¶ 14; Hill Decl. ¶ 13; Paige Decl. ¶ 11.  Investors took Beckman at his word, and invested in the Currency Program based on his representations.  *See* Abrahamson Decl. ¶ 21; Hill Decl. ¶ 17; Paige Decl. ¶ 14.

Brochures reveal the sales-job given by Beckman and his Oxford PCG staff.  A brochure given to Ralph Abrahamson, for example, touted the ability to "significantly outperform[] comparable investment products," while employing strategies with "low to no risk."  *See* Abrahamson Decl., Ex. A, at 2.  Beckman's promotional literature boasted:

5

"This product is structured to provide you with consistent and predictable income and the safety of principal you desire." *Id.*

A brochure given to Larry Paige echoed the same themes. The Currency Program offered "INVESTMENT SAFETY," "CONSISTENT YIELDS," "LIQUIDITY," and "ENHANCED RETURNS," while "MANAGING RISK AND VOLATILITY." *See* Paige Decl., Ex. B, at 2 (allcaps in original).

Yet another brochure made extravagant representations about the Currency Program. The foreign currency trading offered a "Current Yield of 12%* Annually," with "Principal Protected." *See* Aguilar Decl., Ex. 18, at cover page. It promised "Liquidity, Performance and Yield." *Id.* It promised significant profits, risk-free: "The program is designed to be used as a high yield income or growth vehicle that has zero fluctuation of principal." *Id.* at 3.

All of those representations were false and misleading. The funds were not used exclusively for foreign currency trading – instead, they were used to finance a Ponzi scheme. *See* Aguilar Decl. ¶¶ 11-12. The funds were not segregated – instead, they were pooled together. The foreign currency trading did not lead to double-digit profits – instead, there were no profits at all. The Currency Program was not risk-free – instead, it was a complete scam.

### Mum's the Word

The material misrepresentations were not the only problem. Beckman also failed to disclose to investors material facts about the Currency Program. For example, Beckman testified before the SEC that he had significant doubts about the truthfulness of

6

Trevor Cook – the person supposedly running the Currency Program – throughout 2008. *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 264:21-266:21, 267:25-269:23). He thought that Cook was cheating him out of his fair share of revenues. *Id.* at 260:3-261:7, 315:18-25. In fact, Beckman testified that he did not trust Trevor Cook and was never 100% comfortable with him:

> Q:   What percentage of the time from January '08 to July '09 did you suspect maybe Trevor Cook was trying to hustle you?
>
>      .       .       .
>
> A:   ***I never gained confidence regarding being in business with those three*** as part of an entity is [sic].
>
> Q:   You always had doubts about whether Trevor Cook was being truthful with you?
>
> A:   Yeah. ***I was never 100 percent comfortable*** with any of them.

*See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 271:11-23) (emphasis added).

Beckman kept his doubts to himself. By his own admission, Beckman did not disclose to investors his lack of trust in Trevor Cook:

> Q:   Did you ever express any of your doubts about Trevor Cook's truthfulness with any PCG clients?
>
> A:   No.
>
>      .       .       .
>
> Q:   So you had doubts about Trevor Cook's truthfulness but you didn't share those doubts with PCG clients, correct?
>
> A:   Okay.
>
> Q:   Is that correct?
>
> A:   Sure.

7

*See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 276:10-13, 277:2-5).

Beckman supposedly did not trust Trevor Cook, but that did not stop him from entrusting his ***client's money*** to Trevor Cook.  Beckman ignored the bright-light warning signs, and continued to raise funds for the Currency Program.  He took funds from investors without sharing his doubts about the person running the Currency Program.  *See* Abrahamson Decl. ¶ 43; Hill Decl. ¶ 33; Paige Decl. ¶ 28.

Beckman also did not disclose his significant concerns about the accuracy of the financial statements of Oxford Global Advisors.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 332:17-339:25).  According to him, Beckman was surprised that the supposed revenue figures were so high.  *Id.* at 335:6-19, 337:1-10.  His partners "all kind of ha[d] a different story" about the finances.  *Id.* at 338:4-5.  Beckman requested, but did not receive, supporting financial information.  According to him, he investigated the financials for months, without receiving a straight answer:

Q:     What was the additional backup documentation that you asked for?

A:     Statements confirming if there were assets.  For example, cash I want to see the cash that is in this.  Provide me the statement.  Investment accounts I want to see the statement.  Whatever.  I needed documentation to support what was being put on that statement.

.       .       .

Q:     After you received the supporting documentation what did you do?

A:     I never actually received all the supporting documentation.

Q:     They didn't give you everything you asked for?

8

A:      No.  And when they would provide certain pieces, then this financial statement would have to be amended.  I was just trying to get an understanding of their finances.

Q:      Did you ever satisfy yourself that OGA's financial statements were accurate?

A:      Nope.  So I shut it down.

.       .       .

Q:      During what period of time were you personally investigating the accuracy of OGA's financial statements?

A:      I don't have an accounting background.  I was involved with that process from I'm going to guess that spring-ish, February, March-ish of '08 all the way through end of '08.

.       .       .

Q:      It sounds to me like you spent a lot of time and energy looking at the accuracy of OGA's financial statements?

A:      Correct.

*See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 337:16-23, 338:11-24, 339:7-14, 339:22-25).  Beckman reiterated:  he never received supporting financial information that was satisfactory.  *Id.* at 345:17-22.

By his own admission, Beckman did not disclose to investors that he was investigating the financials of Oxford Global Advisors, the company running the Currency Program.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 345:23-346:6).  He did not disclose that he allegedly told Trevor Cook – "a lot" – that there were problems with the financials of Oxford Global Advisors, or disclose that Cook did not

9

give him a straight answer.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 341:24-342:22); *see also* Abrahamson Decl. ¶ 39; Hill Decl. ¶ 29; Paige Decl. ¶ 24.

Beckman failed to disclose many other material facts to investors.  He failed to disclose that attorneys were investigating the Currency Program.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 330:11-332:16); *see also* Abrahamson Decl. ¶ 40; Hill Decl. ¶ 30; Paige Decl. ¶ 25.  He failed to disclose that he had a nationally prominent accounting firm look at the Currency Program, and that the firm was not able to complete its review.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 348:20-354:12); *see also* Abrahamson Decl. ¶ 40; Hill Decl. ¶ 30; Paige Decl. ¶ 25.  He failed to disclose that he hired a computer-forensics firm to back-up the hard drives because he did not trust Cook and the others.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 311:13-315:25); *see also* Abrahamson Decl. ¶ 40; Hill Decl. ¶ 30; Paige Decl. ¶ 25.

Instead, Beckman continued raising money from investors in 2008, keeping his supposed doubts to himself.  *See* Aguilar Decl., Ex. 2, Attachment A.  He kept quiet – and kept raising funds for the Currency Program.

### The Red Flags

Beckman has attempted to portray himself as a victim, claiming that he was hood-winked by Trevor Cook – just like everyone else.  He claims that he was "one of the top portfolio managers in the U.S.," but was fooled by promises of guaranteed, substantial, risk-free profits.  *See* Aguilar Decl., Ex. 17.  In reality, red flags waved all around him.

As early as April, 2008, Beckman knew that the Currency Program involved commingled funds.  That is, he knew – by his own admission – that investor funds were

10

not segregated, but rather were pooled together.  Beckman readily admitted his

knowledge during his testimony before the SEC:

> Q: So when was the first time that you learned that investments in the currency program were pooled?
>
> .    .    .
>
> A: It would have been April – I think around April of '08.
>
> Q: Was that surprising to you?
>
> A: Oh, yes.  Yes.
>
> Q: Why is that?
>
> A: There was – the assets were supposed to be in separate accounts.
>
> Q: Why did you think the assets were supposed to be in separate accounts?
>
> A: Specifically what they told us.
>
> Q: Who is "they"?
>
> A: Oxford Global Advisors.
>
> Q: Who?
>
> A: Chris Pettengill, Jerry Durand, Trevor Cook.
>
> Q: So Trevor Cook, Jerry Durand and Chris Pettengill told you that the client funds would be in separate accounts?
>
> A: Yes.
>
> Q: And that was untrue?
>
> A: Correct.
>
> Q: Did you ever flag that issue with the three of those individuals?
>
> A: Of course I did.
>
> Q: What did you say?

A: I was very excited and I wanted to know what was going on.  And so I questioned them in that respective.

Q: You mean excited in a negative sort of way, not excited and enthusiastic?

A: Yeah.  I wasn't happy see.

Q: Why were you not happy?

A: The structure was not how they claimed it would be.

.  .  .

Q: Trevor Cook had told you that the currency program funds would be in separate accounts and then you learned that in fact that was not true, right?

A: Yes.

.  .  .

Q: So by Chris and Trevor telling you that the money was in separate accounts but in truth they weren't in separate accounts.  In [e]ffect those two guys lied to you; is that right?

A: They did.

*See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 364:12-366:8, 369:9-13, 370:2-7).[1]

The fact that funds were pooled – contrary to his representations to investors – was a glaring red flag that something was seriously wrong.  At the very least, Beckman knew that Trevor Cook was a liar and could not be trusted with his clients' funds.  But Beckman did not end their business relationship.  Quite the opposite – he ramped up his

---

[11] Beckman attempted to claim that he disclosed (orally) the pooling of funds to investors. *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony, at 367:6-12).  But needless to say, the investors themselves tell a much different story.  *See* Abrahamson Decl. ¶¶ 11, 37; Hill Decl. ¶¶ 10, 34; Paige Decl. ¶¶ 8, 22.

fundraising.  After April 2008, Beckman and Oxford PCG raised over $24 million for the Currency Program.  *See* Aguilar Decl., Ex. 2.

A few months later, Beckman received yet another warning about the pooling of investor funds.  On July 21, 2008, Beckman received a troubling email from a former sales representative for the Currency Program:  "Perhaps you should remind Bo that these investors put money into a commingled account against SEC regulations."  *See* Aguilar Decl., Ex. 20.

Beckman suspended the fundraising shortly thereafter, apparently in response to a review by counsel.  On July 29, 2008, Beckman abruptly announced:  "Effective immediately:  no solicitations of the currency program are to continue until further notice. A violation of this instruction will be deemed grounds for dismissal."  *See* Aguilar Decl., Ex. 21.  The suspension of fundraising proved to be short-lived.  The very next month, Beckman and Oxford PCG raised almost $2 million for the Currency Program.  *See* Aguilar Decl., Ex. 2, Attachment A.  Beckman did not disclose the pooling of funds to investors.

The red flags continued.  For example, on September 30, 2008, Beckman asked Trevor Cook a straightforward question.  He simply wanted to know the location of the funds of certain investors:  "I need to know where these accounts (or the money) is for the following investors and their current values:  asap, thanks."  *See* Aguilar Decl., Ex. 23.

Cook responded that this simple request "require[d] a meeting."  *Id.*; *see also id.* (suggesting that Relief Defendant "Hollie" Beckman also attend).  "I want to have plenty

of time and detail out 100% of everything for you." *Id.* The location of the funds, it seems, was not so simple. "***This is not a black and white situation***." *Id.* (emphasis added). Cook even flagged the possibility of illegal conduct by their colleague: "Once I go through in detail with you . . [sic] you will 100% understand . . I was trying to keep you out of this as I didn't want to waste your time and expose you to stupid and possibly illegal s%#t Jerry has done." *Id.*

The fact that the location of the money was "not a black and white situation" was yet another glaring warning sign that something was terribly wrong. Yet Beckman and Oxford PCG kept raising money. From October 1, 2008 to July 9, 2009, Beckman and Oxford PCG raised almost $10 million for the Currency Program. *See* Aguilar Decl., Ex. 2.

Beckman never told investors that the location of their money was "not a black and white situation."

Another email suggests a high level of complicity. On August 7, 2008, Beckman received a forwarded email from the CEO of Western International Securities, a registered broker-dealer. *See* Aguilar Decl., Ex. 22. At the time, Beckman was a registered representative for Western International – so, in effect, the email was from his boss. The CEO asked about the Currency Program, as revealed by subject line: "How's 10.5% fixed return sound." *Id.* The CEO simply added: "Please tell me more about this investment." *Id.*

If the Currency Program were legitimate, then presumably Beckman would have welcomed the opportunity to share its virtues with the CEO. Instead, Beckman had the

14

opposite reaction.  He forwarded the email Cook, and added an ominous prediction:

"***Now the ship beings to sink.  This is not good.***"  *Id.* (emphasis added).

Trevor Cook responded to Beckman by floating a cover story:  "we can blame it on a trainee sales rep who was fired. . . say nothing he did was approved."  *Id.*  Cook suggested that they point fingers at the broker-dealer.  "[A]lso say that Chris ran the product through the broker dealer Calton . . . and Calton approved it . . . ."  *Id.*  Cook also suggested that they hide behind lawyers:  "also say we have opinion letters from attorneys about the product (Saunders Law Offices will supply these)."  *Id.*

Other warning signs flashed before him.  By December, 2008, FINMA, the Swiss financial regulator, began investigating Crown Forex, S.A. – the supposed custodian of client funds in the Currency Program.  Later that month, FINMA prohibited Crown Forex, S.A. from accepting new clients or withdrawing any funds.  FINMA ordered the liquidation of Crown Forex, S.A. in February, 2009, and declared it bankrupt in May, 2009.  *See* Aguilar Decl., Ex. 6 (10/12/10 Beckman testimony at 130:6-149:4).

Beckman learned these facts at or near the time that they took place.  Crown Forex, S.A. – the supposed custodian of client funds – was prohibited from withdrawing money and was in the process of liquidation, and Beckman knew it.  Yet he did not disclose any of these facts to investors.  *See* Abrahamson Decl. ¶ 42; Hill Decl. ¶ 32; Paige Decl. ¶ 27.  Instead, after December 31, 2008, Beckman raised over $3.3 million from investors for the Currency Program.  *See* Aguilar Decl., Ex. 2.

**The False Assurances**

Meanwhile, Beckman and Oxford PCG lulled investors into a false sense of security. They mailed account statements to investors that purported to reflect monthly profits from foreign currency trading. *See, e.g.,* Abrahamson Decl., Ex. C; Hill Decl., Ex. B; Paige Decl., Ex. F. The account statements reported that the investments had increased in value by a double-digit annual rate – just as Beckman had promised. *Id.* The account statements also included individual account numbers, leading investors to believe that their funds were segregated. *Id.* The account statements left no doubt who was in charge: "PLEASE CONTACT BO BECKMAN . . . WITH QUESTIONS." *Id.*

The investors, naturally, took the account statements at face value and thought that they were real. *See* Abrahamson Decl. ¶ 26; Hill Decl. ¶ 18; Paige Decl. ¶ 19. The investors believed that their money was performing well in the Currency Program. *Id.*

In truth, the account statements were a complete sham. At Beckman's direction, an employee of Oxford PCG simply took the amount of the investment, multiplied it by the guaranteed rate of return, and calculated the supposed "profits" from currency trading. *See* Aguilar Decl., Ex. 7 (12-14-10 Edenborg testimony, at 129:15-141:25). The exercise was pure arithmetic, and the "profits" existed only on paper. The account statements did not reflect the real-world returns from currency trading at all.

Beckman's assistant readily admitted in SEC testimony that account statements bore no relation to reality. The "profits" were the product of a calculator, not foreign currency trading:

Q:      You prepared account statements for PCG clients in the Currency Trading
        Program, right?

A:      Yes.

Q:      And you basically just did the math; is that right?

A:      Yes.

Q:      You took their beginning balance, right?

A:      Yes.

Q:      And you took their monthly return rate, right?

A:      Uh-huh.

Q:      Is that right?

A:      Yes.

Q:      And you did the math and came up with a return for the month?

A:      Yes.

Q:      Strictly the arithmetic?

A:      Strictly the arithmetic.

Q:      Was Mr. Beckman aware that that's how you were preparing the
        statements?

A:      Yes.

Q:      You, personally, did not do anything to verify whether the accounts,
        themselves, actually increased in value; is that right?

A:      That is correct.

Q:      You prepared account statements showing that they had increased in value,
        right?

A:      Yes.

Q:      But you, personally, did know, one way or the other, whether the accounts,
        in fact, increased in value?

A:    I did not know, one way or the other.

Q:    You just did the math?

A:    I just did the math.

.      .      .

Q:    Did it ever come to your attention that these account statements were completely phony?

A:    No.

Q:    I mean, as you sit here today, you know these accounts were phony, right?

A:    Yeah, absolutely.

Q:    These accounts didn't really increase in value, right?

A:    Yes.

*See* Aguilar Decl., Ex. 7 (12-14-10 Edenborg testimony, at 136:24-139:23).

## The Transfer of Wealth

Beckman's fraud devastated countless investors.  Collectively, the investors lost over $39 million of the $47.3 million raised by Beckman and Oxford PCG for the Currency Program.  *See* Aguilar Decl. ¶ 14.  Many entrusted Beckman with their life savings, relying on his guarantees of safety.  *See, e.g.,* Abrahamson Decl. ¶ 24.  Imagine working one's whole life – saving a nest egg for retirement – only to learn that one's financial fiduciary was a fraud.

Everything that some investors have ever worked for is now gone.  One investor was a breast cancer survivor, and explained to Beckman that she needed a conservative investment so that she could pay her medical bills.  She, like countless others, put her

trust in Beckman, and believed what he told them.  They banked on Beckman's promises, only to see everything taken away from them.

Beckman fared much better than his investors.  In fact, their loss was his gain.  At the start of the Currency Program, Beckman was of relatively modest means.  *See* Hill Decl. ¶ 36.  Yet the Currency Program became a vehicle for new-found wealth for the Beckmans, by taking money that did not belong to them.  Beckman and his wife Hollie Beckman misappropriated over $7.8 million dollars from accounts containing investor funds.  *See* Aguilar Decl. ¶ 23.

The Beckmans transferred money from accounts containing investor funds, and placed it in accounts that they controlled.  Then, they went on a spending spree.  They lived large by spending, in effect, the life savings of others.  Their lavish lifestyle included the following splurge:

- $210,828 for automobile payments, including a 2010 Jaguar, a 2008 Land Rover, a 2008 Mercedes, a 2006 Land Rover, and a 2000 Mercedes. (Aguilar Decl. ¶ 26(a)).

- $1,493,319 for luxury homes in Minneapolis, Texas, and Florida. (Aguilar Decl. ¶ 26(b); *see also* Aguilar Decl., Ex. 13 (a picture of the "[s]tunning palatial home with numerous upgrades")).

- $695,023 in credit card payments.  (Aguilar Decl. ¶ 26(c)).

- $180,000 for a one-year membership to a suite at Minnesota Wild games. (Aguilar Decl. ¶ 26(e)).

- $103,872 in cash withdrawals.  (Aguilar Decl. ¶ 26(c)).

- $224,801 for construction and repairs.  (Aguilar Decl. ¶ 26(i)).

19

- $997,336 for payments to seven law firms.  (Aguilar Decl. ¶ 26(j)).

The Beckmans literally spent more on resorts – $36,539 – than some investors have left to their name.  *See* Aguilar Decl. ¶ 26(f).

Now that the Currency Program is over – and the money flow has stopped – the Beckmans have, apparently, fallen on hard times.  Their opulent home in the Minneapolis suburbs is now in foreclosure.  *See* Aguilar Decl., Ex. 14.  The foreclosure sale is scheduled to close on ***March 14, 2011***, prompting this emergency motion.  *Id.*  The sale must not take place.  Any remaining equity should go to investors, where it rightly belongs.

## ARGUMENT

### I.     Beckman and Oxford PCG Violated the Federal Securities Laws.

### A.     Beckman and Oxford PCG Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

Beckman and Oxford PCG committed fraud in violation of multiple provisions of the federal securities laws, including Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.  *See* 15 U.S.C. § 77q(a)(1) (prohibiting a person, in the offer or sale of securities, from "employ[ing] any device, scheme, or artifice to defraud"); 15 U.S.C. § 77q(a)(2) (prohibiting a person, in the offer or sale of securities, from "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"); 15 U.S.C. § 77q(a)(3) (prohibiting a person, in the offer or sale of securities, from "engag[ing] in any

20

transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser"); 15 U.S.C. § 78j(b) (prohibiting a person from "us[ing] or employ[ing], in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe"); 17 C.F.R. § 240.10b-5 (prohibiting a person from "employ[ing] any device, scheme or artifice to defraud," and from "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading," and from "engag[ing] in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security").

The investments offered by Beckman and Oxford PCG are investment contracts and therefore securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  An investment contract exists where (1) a person invests his or her money, (2) in a common enterprise, and (3) is led to expect profits from the efforts of the promoter or a third party.  *See SEC v. Edwards*, 540 U.S. 389, 394 (2004); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 289-99 (1946).

The investments in the Currency Program satisfy all three prongs.  **First**, individuals entrusted their money to Beckman and Oxford PCG for the sole purpose of investing in the Currency Program.  **Second**, the Currency Program involved a common enterprise because there was both horizontal and vertical commonality.  There was horizontal commonality because investors contributed to the same program – involving

the same purported trading strategy, by the same purported traders – and did so based on common representations. *See Stone v. Kirk*, 8 F.3d 1079, 1085 (6th Cir. 1993). And, in reality, the funds were deposited into a common pool. There also was vertical commonality because the fortunes of the investors were linked to the fortunes and efforts of Beckman and Oxford PCG. *See Top of Iowa Co-op v. Schewe*, 6 F. Supp. 2d 851 (N.D. Iowa 1998). ***Third***, the investors expected to receive returns on their investments in the Currency Program.

Beckman and Oxford PCG committed fraud when they enticed investors to put their money in the foreign currency scheme. As detailed above, Beckman and Oxford PCG made material misrepresentations to investors about the Currency Program. Beckman misrepresented that investors' funds would be used exclusively for foreign currency trading. He misrepresented that the profits would be significant. He misrepresented that the funds would be safe, and that the Currency Program was a risk-free investment. He misrepresented that funds would remain in segregated accounts. And he misrepresented that investors could withdraw their funds at any time.

Beckman and Oxford PCG also failed to disclose material facts about the Currency Program. He did not disclose that he did not trust Trevor Cook, the person supposedly running the Currency Program. He did not disclose that the financials of Oxford Global Advisors did not make sense, or that he could not get a straight answer to simple questions. He did not reveal investigations by lawyers, or by an accounting firm, or by a computer-forensics company. And he did not disclose the implosion of Crown

Forex, S.A., the supposed custodian of his clients' money.  He saw red flags and warning

signs, but he kept them to himself.

**B.    Beckman and Oxford PCG Violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.**

Beckman and Oxford PCG also violated two provisions of the Investment

Advisers Act of 1940.  *See* 15 U.S.C. §§ 80b-6(1) ("It shall be unlawful for any

investment adviser . . . (1) to employ any device, scheme, or artifice to defraud any client

or prospective client."); 15 U.S.C. § 80b-6(2) ("It shall be unlawful for any investment

adviser . . . (2) to engage in any transaction, practice, or course of business which

operates as a fraud or deceit upon any client or prospective client.").

Beckman and Oxford PCG acted as investment advisers under the Act.  *See* 15

U.S.C. § 80b-2(a)(11) (defining an "investment adviser" to include "any person who, for

compensation, engages in the business of advising others, either directly or through

publication or other writings, as to the value of securities or as to the advisability of

investing in, purchasing, or selling securities . . . .").  Beckman owned and controlled

Oxford PCG, an investment advisory firm registered with the Commission.  *See* Aguilar

Decl., Ex. 16 (SEC attestation); Ex. 6 (10/12/10 Beckman testimony at 41:6-12, 59:25-

63:11, 71:2-11, 161:6-25).

Beckman and Oxford PCG held themselves out as investments advisers.  *See*

Aguilar Decl., Ex. 17 (Oxford PCG website); Ex. 19 (advertisement).  Oxford PCG

clients signed an "Investment Management Agreement."  *See* Aguilar Decl., Ex. 6

(10/12/10 Beckman testimony at 86:25-88:3).  Beckman and Oxford PCG also received

compensation from this business – both as a portion of the fees (*id.* at 53:8-24, 107:20-23, 108:13-18; *see also* Abrahamson Decl. ¶ 22; Paige Decl. ¶ 12), and by diverting millions of dollars of investors' funds for personal use (Aguilar Decl. ¶ 23). *See Ira William Scott*, Investment Adviser Release No. 1752, 1998 WL 611726, at *3 (Sept. 15, 1998); *Alexander V. Stein*, Investment Adviser Release No. 1497, 1995 WL 358127 (June 20, 1995) (Commission decision).

Beckman and Oxford PCG violated Sections 206(1) and 206(2) of the Advisers Act. As explained above, Beckman and Oxford PCG made material misrepresentations to investors, and failed to disclose material facts. They lured money from investors through falsehoods and half-truths.

Beckman also failed to disclose to investors that he had an ownership interest in Oxford Global Advisors. As an investment adviser, Beckman had a duty to disclose to clients all material information in order to "eliminate, or at least expose, all conflicts of interest which might incline [him] – consciously or unconsciously – to render advice which was not disinterested." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963); *SEC v. Wall Street Publ'g Inst., Inc.*, 591 F. Supp. 1070, 1084 (D.D.C. 1984). The failure to disclose an actual or potential conflict of interest violates section 206(2). *See O'Brien Partners, Inc.*, Investment Advisers Act Rel. No. 1772, 1998 WL 744085, at *8 (Oct. 27, 1998); *see also Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir. 2003). Investment advisers also have a duty to disclose to clients all material information that might affect the ability to render unbiased advice. *See Renaissance Cap. Advisors, Inc.*, Investment Advisers Act Rel. No. 1688, 1997 WL 794479, at *3 (Dec. 22, 1997).

Beckman violated that duty to disclose.  Beckman has claimed – in his tax returns, for example – that he owned 96% of Oxford Global Advisors.  *See* Aguilar Decl., Ex. 10. Beckman testified before the Commission that he was a part owner of Oxford Global Advisors, even though his actual ownership percentage was up in the air.  *See* Aguilar Decl., Ex. 6 (10/12/10 Beckman testimony at 110:21-111:20, 118:9-14).

Whatever the size of his ownership stake, Beckman had a duty to disclose that ownership interest.  Beckman received rebates from Oxford Global Advisors when clients invested in the Currency Program.  *Id.* at 93:12-17, 163:22-164:21, 165:8-12; *see also* Ex. 6, 10/13/10 Beckman testimony at 258:12-259:13.  He also expected to receive a share of the revenues of Oxford Global Advisors.  *See* Aguilar Decl., Ex. 6 (10/13/10 Beckman testimony at 260:18-261:7, 262:19-264:20).  He continued to recommend the Currency Program after becoming an owner of Oxford Global Advisors.  *Id.* at 113:24-115:21.  The more money that investors put into the Currency Program, the more money that Beckman made.  *Id.* at 171:25-173:8.

Beckman stood to gain by sending funds to Oxford Global Advisors, and he had a duty to disclose that conflict of interest to investors.  Instead, Beckman funneled tens of millions of dollars into the Currency Program, and kept quiet about his ownership interest.  *See* Aguilar Decl. ¶ 13.  During his SEC testimony, Beckman attempted to claim that he told at least *some* investors of his ownership interest.  But by his own admission, he disclosed the ownership interest to fewer than half of the investors – thus keeping Ralph Abrahamson, Darin Hill, Larry Paige, and many others in the dark.  *See* Aguilar

25

Decl., Ex. 6 (10/12/10 Beckman testimony at 166:7-167:6); *see also* Abrahamson Decl. ¶ 38; Hill Decl. ¶ 28; Paige Decl. ¶ 23.

### C.   Beckman and Oxford PCG Violated Sections 5(a) and 5(c) of the Securities Act.

Beckman and Oxford PCG also violated the federal securities laws by selling and offering to sell unregistered securities.  *See* 15 U.S.C. §§ 77e(a), 77e(c).

Under Sections 5(a) and 5(c) of the Securities Act, the Commission establishes a prima facie case by showing that: (1) no registration statement was filed or in effect for the offering of the securities; (2) the Defendants, directly or indirectly, sold or offered to sell the securities; and (3) the sale was made through the use of interstate commerce.  *See SEC v. Great Lakes Equities Co.*, 1990 WL 260587, at *16 (E.D. Mich. 1990).  Scienter is not required.  *See SEC v. Calvo*, 378 F.3d 1211, 1214-15 (11th Cir. 2004); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

All of the elements apply here.  No registration statement was filed with Commission in connection with the investments in the Currency Program.  *See* Aguilar Decl., Ex. 15 (SEC attestation).  Beckman and Oxford PCG sold those investments to at least 143 investors, including Ralph Abrahamson, Darin Hill, Larry Paige, and many others.  *See* Aguilar Decl. ¶ 13; *see also* Abrahamson Decl.; Hill Decl.; Paige Decl.  And the sales took place in interstate commerce (*e.g.,* the investors sent funds by check or by wire).

Once the Commission makes a prima facie showing, the burden shifts to the

Defendants to prove that the securities offered qualified for a registration exemption.  *See*

*SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).  Defendants cannot carry their

burden here because the exemptions do not apply.

## II.     This Court Should Preserve and Protect the Status Quo by Ordering an Asset Freeze and Granting Other Relief.

The evidence provides a substantial basis for concluding that Beckman and

Oxford PCG committed serial violations of the federal securities laws.  Based on the

SEC's prima facie showing, this Court should grant immediate relief and preserve the

status quo.  Beckman should not be allowed to dissipate assets, sequester funds abroad,

destroy evidence, withhold information, or take other action to frustrate a potential

judgment on the merits.

The SEC is respectfully submitting a draft order that is substantially similar to the

Order entered by this Court in the related *SEC v. Cook* matter.  The highlights of the

proposed draft are as follows.

### A.     An Asset Freeze Is Necessary and Appropriate.

First and foremost, this Court should issue an emergency asset freeze and protect

the assets held by the Defendants and Relief Defendant.  Without an asset freeze, there is

a very real risk that Beckman will dispose of assets that rightfully belong to investors.

This Court enjoys broad power to grant equitable relief in an SEC enforcement

action.  Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the

Exchange Act [15 U.S.C. § 78aa] confer general equity powers upon the Court in a suit

by the SEC.  *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir.

1972).  The full panoply of equitable remedies is available to the Court, including a wide

range of non-injunctive relief.  *See SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

The equitable remedies include the disgorgement of ill-gotten gains obtained by violating

the federal securities laws.  *See SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974);

*Manor Nursing Centers*, 458 F.2d at 1104-05.

The remedy of disgorgement would be a nullity if a defendant could dissipate

assets during the pendency of litigation.  Accordingly, district courts routinely freeze

assets to preserve the status quo, thus ensuring that a defendant does not render

meaningless a disgorgement order.  *See SEC v. Cherif*, 933 F.2d 403, 407 (7th Cir. 1991);

*SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987).

The risk that Beckman might dispose of assets is real, not hypothetical.  In fact,

Beckman's home in Plymouth, Minnesota is currently in foreclosure.  The Sheriff's sale

is scheduled to take place on ***Monday, March 14, 2011***.  *See* Aguilar Decl., Ex. 14.  It is

not entirely clear how much equity exists in his million-dollar home, but it appears that

the equity could equal a few hundred thousand dollars.  Beckman's luxury home in

Florida is also up for sale.  *See* Aguilar Decl., Ex. 13.

Unless this Court issues an asset freeze, there is a very real risk that the homes

could be sold, complicating efforts to recover such assets for investors.

## B.    A Repatriation Order Is Necessary and Appropriate.

This Court also should protect assets by issuing a repatriation order.  That is, the

Defendants and Relief Defendant should return to the jurisdiction of the United States

any assets that exist abroad.  *See SEC v. Chemical Trust*, 2000 WL 33231600, at *12

(S.D. Fla. 2000).

A disgorgement order would be illusory if a defendant could sequester funds in

jurisdictions outside this Court's reach.  A repatriation order is particularly appropriate

where, as here, the underlying fraud involved a transfer of funds to foreign countries.  If

the Beckmans and Oxford PCG have any assets abroad, they should be required to return

those assets to the United States.

### C.     An Order Requiring an Accounting Is Necessary and Appropriate.

In addition to preserving assets, this Court should preserve information.  That is,

this Court should order the Beckmans and Oxford PCG to provide information that will

enable the SEC and the Receiver to untangle the fraud.  *See SEC v. International Swiss*

*Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).  The sworn accountings should identify:

(1) all assets received from the Currency Program; (2) all assets and liabilities of the

Defendants and Relief Defendant; (3) all credit cards and other sources of indebtedness;

and (4) all computers and servers used by the Beckmans or Oxford PCG.

The accounting about computers is especially important.  Last week, the SEC

asked counsel for Beckman about the location of the computer server of Oxford PCG.

The SEC was surprised to learn that Beckman's counsel "do[es] not know where the

server for Oxford PCG is currently located."  *See* Aguilar Decl., Ex. 9.  Beckman's

counsel also reported that he possesses "certain" of Oxford PCG's computers, but the

whereabouts of the other computers remains a mystery.  *Id.*  The SEC requested

clarification, but received none.  *Id.*  In light of the uncertainty, Beckman and Oxford

PCG must provide an accounting to make sure that important evidence is preserved.

### D.     A Document-Preservation Order Is Necessary and Appropriate.

A document preservation order is important as well.  This Court should prohibit

the Beckmans and Oxford PCG from destroying any information relating to the Currency

Program.  At this point, any information relating to the Currency Program should be

preserved, period.  The proposed order builds upon the Order entered in *SEC v. Cook*,

underscoring that this duty fully extends to computers and other electronic media.  The

Beckmans and Oxford PCG also should be required to notify the Receiver if they learn

that any information was destroyed.

### E.     A Discovery Order Is Necessary and Appropriate.

This Court also should exercise its powers under Rule 30(d)(1) and grant leave to

the SEC to depose Beckman for four days of testimony (seven hours each).  *See* Fed. R.

Civ. P. 30(d)(1).  There is a compelling public interest in getting to the bottom of the

fraud committed by Beckman and others.  And as this Court witnessed, the process of

unwinding the fraud takes time.  Trevor Cook sat for testimony for more than 10 days,

above and beyond many days of interviews.  Courts in other cases have recognized the

strong public interest in exposing fraud, and have granted leave to the Commission to

take the time that it needs to receive answers to its questions.  *See, e.g., SEC v. Hollnagel*,

07-cv-4538 (N.D. Ill. 2008) (Dckt. No. 208).

That need is especially strong here.  Beckman has, at best, an uncomfortable

relationship with the truth.  He has a talent for talking in circles – based on

misrepresentations to investors, and interviews with the SEC.  Given the scope of his

fraud, Beckman has a duty to start answering questions.  Any inconvenience on Beckman

is modest, at best – and it is substantially outweighed by the public's right to straight

answers about the loss of their life savings.

### F.      Other Relief Is Necessary and Appropriate.

The draft order covers other ancillary provisions as well, such as guidelines for a

preliminary injunction hearing.  The draft borrows language from the Order entered by

this Court in *SEC v. Cook*.

## III.    This Court Should Appoint a Receiver.

In addition to preserving the status quo, this Court should appoint a Receiver to

unwind the fraud and explore potential recoveries for investors.

District courts enjoy wide discretion to appoint a receiver in SEC enforcement

actions.  *See, e.g., SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *SEC v. Current

Financial Services, Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992).  A receiver is

"particularly necessary in instances in which the corporate defendant, through its

management, has defrauded members of the investing public; in such cases it is likely

that, in the absence of the appointment of a receiver to maintain the status quo, the

corporate assets will be subject to diversion . . . ."  *SEC v. First Financial Group*, 645

F.2d 429, 438 (5th Cir. 1981).

This Court should appoint a Receiver to manage the business and affairs of Oxford

PCG.  In light of his track record, Beckman is not in a position to continue to manage that

business without posing a risk to the current clients of Oxford PCG.  A Receiver is

necessary to protect the remaining investors, and to manage (and, presumably, wind-up) the operations of that entity on a going-forward basis.

It makes abundant sense to appoint R.J. Zayed as the Receiver in this matter. Mr. Zayed has effectively pursued receivership assets in the related *Cook* matter, and is intimately familiar with the facts of the case. The fraud in the *Cook* matter and the *Beckman* matter are closely intertwined. The efficiencies of appointing Mr. Zayed as Receiver are compelling.

The draft order proposed by the SEC is substantially similar to the Order entered by this Court in *SEC v. Cook.* The primary differences include provisions suggested by Mr. Zayed in light of his experience on the *Cook* case, including: (1) clarifying the issue of notice for subpoenae (*see* draft Asset Freeze Order, § I.H); (2) expressly authorizing the Receiver to obtain credit information (*id.* at § I.K); (3) expressly including proposed settlements in the stay provision (*id.* at § VII.A); (4) expressly referring to actions that might diminish the value of the Receiver Estates (*id.* at § VII.D); and (5) clarifying the scope of property covered by the proposed Order (*id.* at §§ IX, XIII).

**IV.    This Court Should Issue a Preliminary Injunction.**

In addition to an asset freeze, this Court should preside over a preliminary injunction hearing, issue a preliminary injunction, and enjoin Beckman and Oxford PCG from violating the federal securities laws. *See* Fed. R. Civ. P. 65(a).

Based on the evidence submitted with this motion, there is substantial evidence that Beckman and Oxford PCG have violated the federal securities laws. There is a very real risk that they will continue to do so. As things stand, Beckman remains a registered

investment adviser, and operates an investment advisory firm.  Beckman also testified that he continues to manage tens of millions of dollars of client funds.  Absent an injunction, those funds could be lost – just like the investments in the Currency Program.

Under the latest Continuing Resolution approved by Congress, funds for the federal government will expire on March 18, 2011.  Accordingly, the Commission respectfully requests a preliminary injunction hearing (as necessary) on or before March 18, 2011.

## CONCLUSION

For the foregoing reasons, this Court should order an asset freeze, appoint a Receiver, issue a preliminary injunction, and grant other appropriate relief against Defendant Beckman, Defendant Oxford PCG, and Relief Defendant Hollie Beckman.

Respectfully submitted,

Dated: March 7, 2011

s/ Steven C. Seeger
John E. Birkenheier
Adolph J. Dean, Jr.
Steven L. Klawans
Steven C. Seeger (IL #6243849)
Justin M. Delfino
Attorneys for Plaintiff
U.S. Securities and Exchange
Commission
Chicago Regional Office
175 West Jackson Blvd.
Suite 900
Chicago, Illinois 60604
T. 312-353-7390
F. 312-353-7398
birkenheierj@sec.gov
deana@sec.gov
klawanss@sec.gov
seegers@sec.gov
delfinoj@sec.gov

James Alexander
Assistant United States Attorney
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN
T. 612-664-5600
F. 612-664-5788
Local Counsel

34