UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

U.S. COMMODITY FUTURES
TRADING COMMISSION,
        Plaintiff,

v.                              Case No.    09-cv-3332 (MJD/FLN)

TREVOR COOK et al.,
        Defendants,

R.J. ZAYED,
        Receiver.

---

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,
        Plaintiff,

v.                              Case No.    09-cv-3333 (MJD/FLN)

TREVOR G. COOK, et al.,
        Defendants,

R.J. ZAYED,
        Receiver.

---

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,
        Plaintiff,

v.                              Case No.    11-cv-574 (MJD/FLN)

JASON BO-ALAN BECKMAN, et al.,
        Defendants,

R.J. ZAYED,
        Receiver.

MEMORANDUM IN SUPPORT OF RECEIVER'S MOTIONS TO
(1) APPROVE THE RECEIVER'S FINAL REPORT AND INTERIM FINAL ACCOUNTING; (2) ENTER THE FIFTH AMENDED FINAL CLAIMS LIST;
(3) APPROVE THE FINAL DISTRIBUTION; AND
<u>(4) APPROVE THE RECEIVER'S PLAN TO CLOSE THE RECEIVERSHIP</u>

**INTRODUCTION**

The above-captioned cases were brought as one of the largest Ponzi schemes in Minnesota history was uncovered. The Court appointed R.J. Zayed as Receiver in these actions to marshal, preserve, and return recovered assets to the victims of the fraud.

The Receiver's work was extensive, resulting in bank accounts, real property, personal property, cash, coins, vehicles, and other assets being seized and liquidated for the benefit of the victims of this fraud. Because the perpetrators' fraudulent activities were global, so too was the work of the Receiver, reaching places such as Panama, Switzerland, the Cayman Islands, Canada, and Jordan. And because the perpetrators engaged with others of similar ilk, the work of the Receiver caused other frauds to be uncovered, as well. For example, after the Receiver filed suit against Peregrine Financial Group ("PFG") for its involvement with this Ponzi scheme, PFG itself was exposed as having operated its own extensive fraud, resulting in its Chief Executive Officer Russell R. Wasendorf, Sr. being sentenced to fifty years in prison and PFG dissolved in bankruptcy. *United States of America v. Wasendorf*, CR12-2021 (N.D. Iowa); *CFTC v. Peregrine Fin. Group, Inc.*, 12-cv-0583 (N.D. Ill.); *In re Peregrine Fin. Group*, 12 B 27488 (N.D. Ill.). Similarly, James Pieron, the proprietor of JDFX and related entities that received millions in Receivership funds, has been convicted for tax evasion stemming from his dealings with Cook in a separate federal criminal case. *United States*

1

*of America v. Pieron*, 1:18-cr-20489-TTL-PJM-1 (E.D. Mich.).

From the onset, the Receiver and the professionals he retained have routinely reported to the Court and the public about their work under the Court's Receivership Orders. The Receiver filed Eighteen Status Reports with the Court, and reported additional details and activities in numerous additional public filings and hearings. In addition, the Receiver has maintained a public website (www.cookkileyreceiver.com) where all such filings are posted, as well as answers to Frequently Asked Questions and other information about the Receivership and the associated criminal cases. With this Motion, the Receiver submits the Final Report and Interim Final Accounting, summarizing the work that the Receivership team has performed from November 2009 through November 2019.

The Receiver now respectfully submits that work under the Court's Receivership Orders is substantially complete and that it is in the best interest of the victims of this fraud to make a final distribution and close the Receivership. The Receiver therefore moves to (1) approve the Receiver's Final Report and Interim Final Accounting; (2) enter the Fifth Amended Final Claims List; (3) approve the Final Distribution, and (4) approve the Receiver's plan to close the Receivership.

**I.     BACKGROUND**

    **A.     Overview**

On November 23, 2009, the United States Securities & Exchange Commission ("SEC") and the United States Commodities Futures Trading Commission ("CFTC") filed civil actions against Trevor G. Cook, Patrick J. Kiley, and entities associated with

2

them. *SEC v. Cook, et al.*, 09-cv-3333 (D. Minn.), *CFTC v. Cook, et al.*, 09-cv-3332 (D. Minn.). Chief Judge Michael J. Davis[1] established a Receivership in the two cases the day the cases were filed.

The SEC's civil action against Jason Bo-Alan Beckman and his entities followed on March 7, 2011. *SEC v. Beckman, et al.*, 11-cv-574 (D. Minn.). The Court extended the Receivership to that matter, as well.

R.J. Zayed is the appointed Receiver these three actions and the law firm of Carlson Caspers serves as the Receiver's main counsel.[2]

The government also brought criminal charges. Cook and Christopher Pettengill pleaded guilty. *United States of America v. Trevor Gilson Cook*, 10-cr-075 (D. Minn.); *United States of America v. Christopher Pettengill*, 11-cr-192 (D. Minn.). Beckman, Kiley, and Gerald Durand were convicted by a jury. *United States of America v. Beckman et al.*, 11-cr-228 (D. Minn.). All are now serving or have served lengthy federal prison sentences.[3]

---

[1] Judge Davis was Chief of the District Court until 2015.

[2] On April 3, 2013, the Court granted the Receiver's request for leave to recuse himself from the Receiver's case against Associated Bank, and appointed Tara Norgard, Brian Hayes, and Russell Rigby to act collectively as Receivers in that matter. This recusal was made to avoid any potential conflict of interest in conjunction with Mr. Zayed's move to the law firm of Dorsey & Whitney. In October 2016, Mr. Rigby moved from the District of Minnesota and the Carlson Caspers firm and ceased in his roles as a Receiver and counsel in this matter. Mr. Zayed continued to serve as the Receiver with regard to Receivership matters other than Associated Bank.

[3] According to the Bureau of Prison website (www.bop.gov), the release dates for the perpetrators of this fraud are as follows: Cook, February 15, 2032; Kiley, December 17, 2029; Beckman, July 30, 2038; Durand, November 12, 2029. Pettengill was released from federal custody on July 13, 2018 after serving his sentence.

In March 2015, the SEC and CFTC filed dispositive motions in the civil cases. Specifically, the SEC filed motions for summary judgment against Kiley and Beckman, as well as motions for the entry of consent judgments against Cook and the various other Receiver Estates. The CFTC filed a motion for summary judgment against Kiley. All motions included requests for permanent injunctive relief.

Due to the pendency of the defendants' criminal appeals at the time the motions were filed, the Court continued the hearings until the appellate process was complete. On May 12, 2015, the Eighth Circuit affirmed the criminal convictions and sentences of each defendant, *United States of America v. Beckman et al.*, Nos. 13-1162, 1163, 2603, 2015 U.S. App. LEXIS 7805 (8th Cir. May 12, 2015), and on October 5, 2015, the United States Supreme Court denied Beckman's Petition for Writ of Certiorari, *United States of America v. Beckman et al.*, 11-cr-192 at Dkt. 553. On January 12, 2016, the Court granted the SEC and CFTC's motions for summary judgment and entered final judgment as to all defendants in the civil actions.

The Court closed the civil actions brought by the SEC and CFTC, but ordered the powers and duties of the Receivership to remain in full force and effect unless or until otherwise ordered.

### B.    The Receivership Orders

The Court issued Receivership Orders in each of the three actions. Specifically, on November 23, 2009 the Court entered an Order appointing the Receiver in *SEC v. Cook et al.*, for (1) the estates of Defendants Trevor G. Cook, Patrick J. Kiley; (2) Defendants UBS Diversified Growth LLC, Universal Brokerage FX Management, LLC,

4

Oxford Global Advisors, LLC, Oxford Global Partners, LLC; (3) Relief Defendants Basel Group, LLC, Crown Forex, LLC, Market Shot, LLC, PFG Coin and Bullion, Oxford Developers, S.A., Oxford FX Growth, L.P., Oxford Global Managed Futures Fund, UBS Diversified FX Advisors, LLC, UBS Diversified FX Growth L.P., and UBS Diversified FX Management LLC; (4) all funds, accounts, and other assets held by or for Relief Defendants Clifford Berg and Ellen Berg, which were received, directly or indirectly, from the Defendants or were acquired with funds or other assets received, directly or indirectly, from the Defendants; and (5) every other corporation, partnership, trust and/or other entity (regardless of form) which is directly or indirectly owned by or under the direct or indirect control of Cook and Kiley (collectively the "Receiver Estates"). Order Appointing Receiver, 09-cv-3333, Dkt. No. 13, at 4 (Nov. 23, 2009); see also Amended Order Appointing Receiver, 09-cv-3333, Dkt. No. 18, at 4 (Nov. 24, 2009); Second Amended Order Appointing Receiver, 09-cv-3333, Dkt. No. 68 (Dec. 11, 2009).

On November 23, 2009 the Court also entered an Order appointing the Receiver in *CFTC v. Cook et al.*, 09-cv-3332, for Defendants Trevor Cook d/b/a Crown Forex, LLC, Patrick Kiley d/b/a Crown Forex, LLC, Universal Brokerage FX and Universal Brokerage FX Diversified, Oxford Global Partners, LLC, Oxford Global Advisors, LLC, Universal Brokerage FX Advisors, LLC f/k/a UBS Diversified FX Advisors, LLC, Universal Brokerage FX Growth, L.P. f/k/a UBS Diversified FX Growth, L.P., Universal Brokerage FX Management, LLC, f/k/a UBS Diversified FX Management, LLC, and UBS Diversified Growth, LLC, and their affiliates and subsidiaries, and all funds,

5

properties, premises, accounts and other assets directly or indirectly owned, beneficially or otherwise, by the Defendants individually or collectively, including, but not limited to, investors' funds. *Ex Parte* Statutory Restraining Order, 09-cv-3332, Dkt. 21, at 7 (Nov. 23, 2009); *see also* Order Continuing Appointment of Temporary Receiver, 09-cv-3332, Dkt. 96 (Dec. 11, 2009).

On March 8, 2011, the Court entered an Order appointing the Receiver in *SEC v. Beckman, et al.*, for (1) the estate of Jason Bo-Alan Beckman; (2) The Oxford Private Client Group, LLC; (3) all funds, accounts, and other assets held by or for the benefit of Relief Defendant Hollie Beckman which were received, directly or indirectly, from the Defendants or were acquired with funds or other assets received, directly or indirectly, from the Defendants; and (4) every other corporation, company, partnership, trust and/or other entity (regardless of form) which is directly or indirectly owned by or under the direct or indirect control of Defendant Beckman, Defendant Oxford PCG, or Relief Defendant Hollie Beckman (collectively the "Receiver Estates"). Order Appointing Receiver, 11-cv-574, Dkt. 10, at 1-2 (March 3, 2011).

The above-referenced Orders in these three cases are collectively referred to in this report as the "Receivership Orders."

Among other things, the Court's Receivership Orders require the Receiver to:

> A.  Take exclusive custody, control, and possession of all funds, property, and other assets in the possession of, or under the control of the Defendants wherever situated that he has a reasonable a basis to believe is related to this action, and that is consistent with this Court's orders. The Receiver will also take exclusive custody, control, and possession of all customer funds and property and other assets traceable to customers that are in the possession of, or under the control of Defendants. The Receiver shall have full power to sue for, collect, receive and

6

take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information and digital data and other papers and documents of Defendants, including documents related to customers or clients whose interests are now held by or under the direction, possession, custody or control of the Defendants.

B. Preserve, hold and manage all receivership assets, and perform all acts necessary to preserve the value of those assets, in order to prevent any loss, damage or injury to customers or clients;

C. Prevent the withdrawal or misapplication of funds entrusted to the Defendants and otherwise protect the interests of customers or clients;

D. Collect all money owed to the Defendants;

E. Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal or foreign jurisdictions necessary to preserve or increase the assets of the Defendants or to carry out his or her duties pursuant to this Order.

Order Continuing Appointment of Temporary Receiver, 09-cv-3332, Dkt. 96 (Dec. 11, 2009).

In addition to the Receivership Orders, the Court entered Orders freezing the assets of the Defendants and Relief Defendants named in the three actions, wherever such assets were located.

## II. MOTION TO APPROVE THE RECEIVER'S FINAL REPORT AND INTERIM FINAL ACCOUNTING

As noted above, since November 2009, the work of the Receiver has been consistently reported to the Court and the public in Status Reports and numerous additional public filings and hearings. All such filings have been made part of the public record on this Court's docket and posted on the Receiver's web site.

The Receiver now proposes to make a Final Report and Interim Final Accounting ("Final Report") to the Court, which is attached as Exhibit A to the Declaration of Tara C. Norgard filed herewith. The proposed Final Report summarizes all activities of the Receiver since the inception of the Receivership and also includes an Interim Final Accounting. With the goal of providing the Court and the public with the most complete report on the finances of the Receivership at its anticipated close, the Interim Final Accounting includes proposed line items for the disbursements associated with the co-pending Fee Petition for accrued professional fees and services and for the proposed Closure Plan outlined below.

As detailed in that Interim Final Accounting, the Receiver has recovered a total of $21,661,715.86 in liquidated assets for the Receivership Estate. Of that total, and assuming the proposed distribution and payment of the co-pending Fee Petition noted above, the Receiver will have made distributions to the victims of this fraud totaling $11,707,778.20 in cash and credits, paid $10,029,734.20 in professional fees and necessary costs and expenses. (Norgard Decl., Ex. A, Appdx. 1.)

The Receiver respectfully requests that the Court approve the Receiver's proposed Final Report and Interim Final Accounting at this time. As described in Part V, *infra*, as part of the closure process the Receiver proposes to make a Supplemental Final Accounting when all remaining closure activities are complete and any pending liabilities are finalized.

### III.     MOTION FOR ENTRY OF A FIFTH AMENDED FINAL CLAIMS LIST

The Receiver respectfully moves the Court for an Order entering the Receiver's proposed Fifth Amended Final Claims List. The Receiver's claim recognition, finalization, and amendment process has been detailed in numerous Court filings and Orders. That process is also summarized in the Receiver's proposed Final Report. The proposed Fifth Amended Final Claims List, which is filed as Exhibit B to the Norgard Declaration, sets forth the recognized claim amounts for 737 investors in this fraud, and a total of $160,697,655.32 in recognized claims.[4] These claim amounts are used as the basis for calculating each investor's *pro rata* share of the civil restitution distributed by the Receiver.

The proposed Fifth Amended Final Claims List makes two kinds of updates from the Fourth Amended Final Claims List, which was entered by the Court March 30, 2017. Neither of these updates impacts the number of Recognized Claims or the total amount of those claims.

First, the proposed Fifth Amended Final Claims List is updated with all known current contact information for investors with Recognized Claims. From the onset of the Receivership, the Receiver has worked with investors to ensure that their contact information remains current with the Receiver. This has been done through the Receiver's proactive efforts, *i.e.*, in conducting research and outreach when distribution

---

[4] To protect the private financial information of the investors, and consistent with prior filings, each claim is identified by number on the public docket. The names and addresses of the individuals associated with the claims identified in the Fifth Amended Final Claims List are being provided to the Court *in camera*. (Norgard Decl. ¶ 3.)

checks have been returned to the Receiver through United States mail, and in coordination with investors who have contacted the Receiver's office. As a result of these ongoing efforts, the Receiver has been able to ensure that as many victims as possible have been able to receive and cash their distribution checks.

Second, the proposed Fifth Amended Claims List reflects all Court Orders granting investors' petitions for name changes and divisions of claims. Such petitions have arisen, for example, in instances where the original investor had passed and proper documentation was provided to the Court to transfer the claim to the estate or heir(s) of the investor.

The Receiver respectfully requests that the Court approve the proposed Fifth Amended Final Claims List, which is filed as Exhibit B to the Norgard Declaration, setting forth the recognized claim amounts for 737 investors in this fraud, and a total of $160,697,655.32 in recognized claims.

## IV. MOTION TO APPROVE FINAL DISTRIBUTION

The Receiver proposes to make a final *pro rata* distribution, in the form of checks and credits, of approximately $400,000.00 to claimants identified on the proposed Fifth Amended Final Claims List. With this Final Distribution, the Receiver seeks to disburse substantially all remaining funds of the Receivership, including funds that remain unclaimed from the Receiver's prior distributions.

More specifically, the Receiver's cash on hand includes $126,933.74 representing checks from the Receiver's prior distributions that remain uncashed. (Norgard Decl., Ex. A, Final Report at Appendix 1.1.) These uncashed checks generally fall into four

categories.

First, $48,467.75 in uncashed checks remain from the Fourth Interim Distribution, in which funds from the Receiver's settlement with NRP Financial ("NRP") and Western International Securities, Inc. ("Western") were distributed to the victims of this fraud. Investors were advised that by cashing the Fourth Interim Distribution checks, they forfeited any rights to pursue individual claims against NRP and Western.[5] On the other hand, any investor who did not cash his or her check within ninety (90) days of issuance would forfeit his or her claim to the Fourth Interim Distribution, but would retain the right to pursue individual claims against NRP and Western. (Order Approving Settlement and Barring the Filing and Prosecution of Released Claims Against Western International Securities, Inc., 09-cv-3333, Dkt. 924.[6])

Second, a small number of investors advised the Receiver that they declined to cash distribution checks for personal tax or accounting reasons.

Third, as noted above and detailed in the Receiver's proposed Final Report, throughout the Receivership, the staff of Carlson Caspers has worked to locate victims whose distribution checks were returned as undeliverable from the United States Post Office. Many investors and heirs were found through these efforts. Nevertheless, and despite these ongoing best efforts over the course of many years, no updated contact

---

[5] In accordance with the terms of the Receiver's settlements with those entities, two separate checks were mailed to each investor for the Fourth Interim Distribution, one for the settlement with Western and another for the settlement with NRP.
[6] The majority of the Receiver's filings and related Court Orders have been identically filed in the three civil cases. For ease of reference, docket citations in this motion are made to the SEC v. Cook, 09-cv-3333, unless otherwise noted.

11

information or beneficiaries can be found for certain of these investors whose distribution checks have been returned.

The fourth and last general category of uncashed checks are those that have not been returned to the Receiver but have never been cashed. The Receiver's staff has also undertaken a longstanding effort to contact these investors to determine if replacement checks were needed. As with the returned checks, the Receiver's staff was able to contact many investors who had simply forgotten to cash distribution checks or never received them in the mail. Yet here again, despite these ongoing and best efforts, a number of distribution checks remain unreturned and uncashed.

A summary of the uncashed checks that remain from the Receiver's distributions is found at Appendix 1.1 to the Final Report. (Norgard Decl., Ex. A, Appx. 1.1.) In Part V, below, the Receiver moves to make a Final Distribution that includes funds that remain in the Receiver's bank account from uncashed distribution checks.

The distribution rate for the proposed Final Distribution would be approximately 0.28%, bringing the total distribution rate to approximately 8.00%, or approximately eight cents for every dollar lost to the fraud. Checks to victims in this distribution would range from approximately $26.02 to $16,108.96, with an average distribution amount of about $562.59. If the Court approves this Final Distribution, the Receivership's total distributions to victims of the fraud would be $11,707,778.20. (Norgard Decl. ¶ 4.)

Consistent with the Receiver's prior interim distributions, and the law of restitution generally, claimants who have recovered lost funds from sources other than the Receiver and have an overall recovery that exceeds the median distribution rate to all

victims in these cases will be excluded from this distribution or have their *pro rata* shares proportionately reduced so that the Receiver's distributions do not put any investor ahead of the others in terms of recoveries. *See generally* 18 U.S.C. § 3664(j)(2) (explaining that a victim's restitution is reduced by subsequent recoveries). Courts have consistently found *pro rata* distributions to be appropriate, especially for fraud victims of Ponzi schemes. *Donell v. Kowell*, 533 F.3d 762, 776 (9th Cir. 2008) ("[C]ourts have long held that is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell."); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-9 (2d Cir. 2002); *see also Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (rejecting tracing "fiction" where receivership fund consisted of money acquired by fraud perpetuated against many victims); *SEC v. George*, 426 F.3d 786, 799 (6th Cir. 2005)*; SEC v. Forex Asset Management LLC*, 242 F.3d 325, 331-2 (5th Cir. 2001); *CFTC v. Topworth International, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 1999); *United States v. Durham*, 86 F.3d 70, 72-3 (5th Cir.1996); *SEC v. Elliott*, 953 F.2d 1560, 1569-70 (11th Cir. 1992).

The Court has wide latitude when it exercises its inherent equitable power in approving a plan of distribution of receivership funds. *SEC v. Forex Asset Mgmt. LLC*, 242 F.3 325, 331 (5th Cir. 2001) (affirming district court's approval of plan of distribution because the court used its discretion in "a logical way to divide the money."); *Quilling v. Trade Partners, Inc.*, 2007 WL 107669, *1 (W.D. Mich. 2007) (same). In approving a plan of distribution in a receivership, "the district court, acting as a court of equity, is afforded the discretion to determine the most equitable remedy." *Forex*, 242

F.3d at 332. The Court may adopt any plan of distribution that is logical, fair, and reasonable. *SEC v. Wang*, 944 F.2d 80, 83-84 (2d Cir. 1991); *Basic Energy*, 273 F.3d at 671; *Quilling*, 2007 WL 107669 at *1. The district court's choice of distribution plan is reviewed for abuse of discretion. *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) (holding that "the district court's distribution plan will not be disturbed on appeal unless that discretion has been abused").

The proposed Final Distribution is consistent with the interim distributions that the Court has previously approved. The Receiver believes that the Final Distribution proposed in this motion is logical, fair, and reasonable in that it seeks to distribute substantially all of the remaining funds to the victims of this fraud and their known heirs.

## V. MOTION TO APPROVE CLOSURE PLAN

The Receiver respectfully submits that the duties and responsibilities set forth in the Court's Receivership Orders are substantially complete. The Receiver's investigation of the assets and affairs of the Receiver Estates has concluded. All meaningful Receivership assets of value known to the Receiver have been seized and liquidated. All litigation involving the Receiver has been resolved. There are no remaining collectable judgments or debts to be paid to the Receiver.[7] As such, the Receiver submits that it is appropriate to close the Receivership at this time and hereby moves for the Court's approval of the plan set forth below to close the Receivership ("Closure Plan"). The Receiver respectfully submits that the proposed Closure Plan will promote the orderly

---

[7] This does not include civil disgorgement and criminal restitution judgments against Defendants and Relief Defendants owed to the government and government agencies.

14

and prompt wind up of this Receivership in an expeditious and cost-effective manner while ensuring fulfillment of the Court's Receivership Orders and all applicable laws and regulations.

The Court's power over an equity receivership and to determine appropriate procedures for administering a receivership is "extremely broad." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986); *see SEC v. Basic Energy*, 273 F.3d 657, 668 (6th Cir. 2001); *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992). The primary purpose of an equity receivership is to promote the orderly and efficient administration of the estate for the benefit of the creditors. *See Hardy*, 803 F.2d at 1038. The Receiver respectfully submits that the Closure Plan presented herein best serves this purpose.

### A. Pay Accrued and Fees and Expenses

In the contemporaneously filed Fee Petition, the Receiver seeks authority to pay accrued fees and costs for professional services from March 1, 2019 through November 24, 2019 in the total amount of $82,547.90.

The Receiver anticipates certain final fees and expenses to be incurred in implementing the Closure Plan proposed in this motion. Those anticipated fees and expenses are accounted for in the Closure Reserve outlined below. The Receiver proposes to file a Final Fee Petition, to be paid from the Closure Reserve outlined in Part V.B., after all final steps in the Closure Plan are complete.

### B. Establish Closure Reserve and Pay Any Final Tax Obligations

The Receiver seeks authority to maintain a closure reserve with remaining funds of approximately $52,000.00 to pay any final tax obligations associated with this

Receivership and the fees and costs associated with closure ("Closure Reserve"). The Receiver seeks further authority in the present motion to pay any such tax obligations directly from the Closure Reserve, without further Order from the Court.

As soon as any such final tax obligations have been paid or otherwise settled, the Receiver proposes to submit a Supplemental Final Accounting, make a final Fee Petition, and submit a proposed Order for Final Closure.

### C. Dispose of Documents and Other Miscellaneous Property

In connection with this Receivership, the Receiver has seized and otherwise accumulated a significant amount of documents and unsaleable miscellaneous things that are located in the Receiver's office and in an off-site storage facility. To avoid the continued cost of storing these documents and things, as part of the Closure Plan the Receiver now seeks authority to destroy or otherwise dispose of all documents and other items relating to the Receivership.[8]

### D. Close Receiver Website, Email Address, and Hotline

From the onset of this Receivership, the Receiver has maintained a website and dedicated email address and phone line to communicate with investors and to provide open and transparent reports and information about the Receiver's activities. A compilation of that website is provided as Appendix 2 to the Receiver's proposed Final Report. (Norgard Decl., Ex. A at Appx. 2.)

---

[8] The Receiver will maintain requisite books and records from the operations of the Receivership for the period proscribed by relevant federal and state tax laws.

The website is currently paid for and scheduled to remain active through April 8, 2020. After that time, an annual renewal fee of about $600.00 would be due to maintain the website going forward. The Receiver submits that the utility of the website will have run its course by April 2020 and that future payment for and maintenance of the site is not warranted. The Receiver therefore proposes to maintain the website until April 2020 and to close down the site at that time, along with the Receiver's dedicated phone line and email address.

### E.   File Supplemental Final Accounting, Final Fee Petition, and Proposed Final Order for Closure

In addition to effectuating the proposed Final Distribution and the closure activities outlined above, the Receiver anticipates two final remaining activities, namely, (1) preparing and filing a Supplemental Final Accounting that updates Interim Final Accounting with the Final Distribution, payment of any final tax obligations, and payment of final professional fees and services, and (2) preparing and filing a proposed Final Closure Order.

Although the closure activities outlined in this motion will be largely complete in early 2020, the timing of the Supplemental Final Accounting and proposed Final Closure Order will depend on the timing of the finalization of any remaining tax liabilities. The Receiver has been advised that due to the timing of tax filings and IRS regulations governing responsive actions, such finalization may not be complete until 2021.

To the extent any funds remain in the Receiver's account after payment of final fees, expenses, and tax liabilities, the Receiver's proposed Final Closure Order will

request that any such remaining balance be remitted the SEC for distribution to the United States Treasury.

### F.    Cease Any Further Activities

With the exception of the activities outlined above, the Receiver respectfully submits that his duties and obligations under the Court's Receivership Orders are complete. As such, the Receiver's Closure Plan submits that the Receiver will cease any further activities that are not otherwise ordered by the Court.

## CONCLUSION

The Ponzi felons who perpetrated this Ponzi Scheme caused enormous financial and personal destruction to countless lives. By establishing this Receivership, the Court and the government agencies that brought the civil cases have ensured that the fullest possible extent of recovery could be delivered to the victims of this fraud. Having now completed the investigative and asset recovery tasks set forth in the Court's Receivership Orders, the Receiver respectfully submits that it is in the best interest of the victims of this fraud to wind down and close the Receivership as set forth in the motions detailed herein.

Dated: December 2, 2019         Respectfully submitted,

                                            *s/ Tara C. Norgard*
                                            Tara C. Norgard (MN Bar No. 307,683)
                                            Brian W. Hayes (MN Bar No. 294,585)
                                            Samuel L. Lockner (MN Bar No. 341,095)
                                            Carlson, Caspers, Vandenburgh
                                             & Lindquist, P.A.
                                            225 S. 6th Street, Suite 4200
                                            Minneapolis, MN 55402
                                            Telephone: (612) 436-9600
                                            Facsimile: (612) 436-9605
                                            Email: tnorgard@carlsoncaspers.com

                                            *Attorneys for Receiver R.J. Zayed*